Clifford V. LATTA, Plaintiff-Appellant,

v.

C. J. FITZHARRIS et al., Defendants-Appellees.

No. 71–2909.

United States Court of Appeals, Ninth Circuit.

April 15, 1975.

---

James F. Hewitt, Asst. Federal Public Defender (argued), San Francisco, Cal., for plaintiff-appellant.

Sanford Svetcov, Deputy Atty. Gen. (argued), for defendants-appellees.

## OPINION

Before CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge, with whom Circuit Judges KOELSCH, TRASK, GOODWIN and SNEED concur:

In April, 1966, Latta was on parole from his imprisonment under a California armed robbery conviction. His parole officer, who had reason to believe that he was violating the conditions of his parole, arrested him at the house of an acquaintance. No question is raised as to the validity of this arrest. When arrested, Latta was holding in his hand a pipe containing marijuana. About six hours after the arrest, Latta'a parole officer and two local police officers went to Latta's home, which was thirty miles away. There is nothing in the record to suggest that the officers accompanied the parole officer for any reason other than to expedite the search, or that they initiated it in any way. Thus this case is not one in which the parole officer was a stalking horse for the police. *See* United States v. Hallman, 3 Cir., 1966, 365 F.2d 289, 292; People v. Coffman, 1969, 2 Cal. App.3d 681, 687–89, 82 Cal.Rptr. 782, 785–87. When the officers arrived at Latta's home, no one was there. Soon, however, Latta's stepdaughter arrived and admitted them to the house. They identified themselves, told her that they were there to conduct a search, and in response to her query said that they did not need a warrant. The search proceeded, and a four-and-one-half pound brick of marijuana was discovered in the garage. This evidence was the basis of Latta's later state conviction for posses-

sion of marijuana with intent to distribute it, the conviction that he now attacks. It is undisputed that Latta has exhausted his state remedies.

Latta makes two arguments on this appeal: first, that his parole officer's warrantless search of his home violated the Fourth Amendment as applied to the states by the Fourteenth, and second, assuming that the search was valid, that the evidence that was seized could only be used as a basis for revoking his parole.

## I. *The Validity of the Search*

### A. *The Fourth Amendment Applies.*

In California, as elsewhere, parole officers have long enjoyed broad powers to search parolees under their supervision. The traditional view of a parolee's Fourth Amendment rights is summarized in the leading case of People v. Hernandez, 1964, 229 Cal.App.2d 143, 150, 40 Cal.Rptr. 100, 104:

> For the purpose of maintaining the restraints and social safeguards accompanying the parolee's status, the authorities may subject him, his home and his effects to such constant or occasional inspection and search as may seem advisable to them. . . . He may not assert [Fourth Amendment] guaranties against the correctional authorities who supervise him on parole. . . . If this constitutional fact strips him of constitutional protection against invasions of privacy by his parole officer, the answer is that he has at least as much protection as he had within prison walls. He did not possess this guaranty in prison and it was not restored to him when the gates of parole opened.

However, despite this broad rationale, the principle has its limits; under recent decisions parolees are entitled to Fourth Amendment protection in certain discrete situations. *See generally* White, The Fourth Amendment Rights of Parolees and Probationers, 31 U.Pitt.L.Rev. 167, 172–76 (1969). For example, it has been held, in California and elsewhere, that police, as distinguished from parole officers, cannot initiate searches of parolees under circumstances in which they could not search other citizens. *See* People v. Coffman, 1969, 2 Cal.App.3d 681, 687–689, 82 Cal.Rptr. 782, 785–87; United States v. Hallman, 3 Cir., 1966, 365 F.2d 289, 292. Likewise, a search by a parole officer has been held invalid where it was for the purpose of harassing or oppressing the parolee. *See* United States ex rel. Randazzo v. Follette, S.D.N.Y., 1968, 282 F.Supp. 10, 13, aff'd on other grounds 2 Cir., 1969, 418 F.2d 1319. A California court has held that parolees are entitled to the benefit of the rule of announcement necessary to perfect a law enforcement officer's entry into a house. People v. Rosales, 1968, 68 Cal.2d 299, 66 Cal.Rptr. 1, 437 P.2d 489.

Moreover the theory upon which courts have usually relied to justify stripping parolees of Fourth Amendment protection has been widely criticized. Commentators have repeatedly criticized the notion that the status of parolees is legally comparable to that of prisoners in actual custody as being logically inconsistent and ignoring reality. *See e. g.,* White, *supra* at 178–81; Note, The Parole System, 120 U.Pa.L.Rev. 282, 289–96 (1971); Note, Parole: A Critique of Its Legal Foundations and Conditions, 38 N.Y.U. L.Rev. 702, 704–08, 711–20 (1963). In holding that parolees are entitled to minimum due process type hearings before their parole may be revoked, the Supreme Court has specifically rejected the theory that parole officers have unfettered discretion in dealing with parolees, and refused to attach so broad a significance to the "custody" theory. Morrissey v. Brewer, 1972, 408 U.S. 471, 477–84, 92 S.Ct. 2593, 33 L.Ed.2d 484.

It is thus too late in the day to assert that searches of parolees by their parole officers present no Fourth Amendment issues. Rather, such searches may be held illegal and the evidence obtained therefrom suppressed unless they pass

muster under the Fourth Amendment test of reasonableness.[1]

### B. *The Standard of Reasonableness.*

The search of Latta's home cannot be justified on the basis of the traditional standard of probable cause, and California does not argue that it can. It does not follow, however, that the search is invalid. A California parolee is in a different position from that of the ordinary citizen. He is still serving his sentence. He remains under the ultimate control of the Adult Authority and the immediate control of his parole officer. His parole is subject to revocation for reasons that would not permit the arrest or incarceration of other persons. Many of the conditions of his parole relate to noncriminal conduct that is thought likely to make his rehabilitation more difficult. *See generally* Cal.Penal Code §§ 3040–3065; 5077; 2943. In a sense, the parole officer stands *in loco parentis* to the parolee.

The overriding goal of the parole system is to give the parolee a chance to further and to demonstrate his rehabilitation while serving a part of his sentence outside the prison walls. It is hoped that he will never return to prison. An excellent statement of the working of the system appears in Morrissey v. Brewer, *supra*, 408 U.S. at 477–79, 92 S.Ct. 2593; *see also* R. Dawson, Sentencing, 316–26 (1969).

To the extent that there is a "law enforcement" emphasis, it is to deter the parolee from returning to a life of crime. *See id.* There is a risk that persons who have once been committed to prison will commit additional antisocial acts, and the commission of a crime is generally sufficient reason to revoke parole. See Morrissey v. Brewer, *supra*, 408 U.S. at 479, 483, 92 S.Ct. 2593; R. Dawson, *supra* at 370. Thus California properly argues: "Parole is a risky business. Recid-

ivism is high. If parole fails too often, it may lose viability as a corrective institution. . . . When, as here, a parolee is in violation of his parole, the parole agent's higher duty is to protect the parole system and to protect the public." (Br. p. 4.) However, this feature of the parole system, important as it is, does not predominate. Between 35% and 45% of parolees are returned to prison, but in only one-third of these cases is the parolee returned to prison for committing a criminal offense, *see* President's Comm. on Law Enforcement and Admin. of Justice, Task Force Report: Corrections 62 (1967); presumably fewer still are prosecuted on the new charge. *See* Morrissey v. Brewer, *supra*. The fact that crimes are detected during the administration of the parole system does not convert what is essentially a supervisory and regulatory program into a subterfuge for criminal investigations.

The purposes of the parole system give the parole authorities a special and unique interest in invading the privacy of parolees under their supervision. In order to fulfill his dual responsibilities for helping the parolee to reintegrate into society and evaluating his progress, and for preventing possible further antisocial or criminal conduct by the parolee, it is essential that the parole officer have a thorough understanding of the parolee and his environment, including his personal habits, his relationships with other persons, and what he is doing, both at home and outside it. It is equally important that this information be kept up to date. *See* R. Dawson, *supra* at 326, 332–33; Newman, Concepts of Treatment in Probation and Parole Supervision, 25 Fed.Prob. 11 (March 1961); Note, Observations on the Administration of Parole, 79 Yale L.J. 698, 699–700 (1970). Much of this information can be obtained by methods which necessitate little or no invasion of the parolee's privacy, such as interviews with the parolee

---

1. California raises the question whether it can constitutionally expressly condition parole upon a waiver of the parolee's Fourth Amendment rights. It does not argue that any waiver took place. We therefore do not consider the question that California seeks to present. *Compare* Holtzoff, The Power of Probation Officers to Search and Seize, 31 Fed.Prob. 3, 7 (Dec. 1967) *with* Note, *supra*, 120 U.Pa.L.Rev. at 330–39.

himself or with his employer, family, or friends and visits to his house. However, these techniques have inherent limitations. *See* R. Dawson, *supra* at 326–32; Newman, *supra* at 15–16. For example, it may be impossible to determine whether a parolee is using alcohol or narcotics, whether he is keeping weapons or other contraband in his home, whether he is using or preparing to use his home as a base for improper or unlawful activities, whether he is making a real effort to obtain employment, or the general nature of his home environment, without conducting some type of search.

On the other hand, the parolee's interest in maintaining his personal privacy, even as against his parole officer, is in many respects like that of other citizens. As Chief Justice Burger has succinctly stated:

> The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. Morrissey v. Brewer, *supra*, 408 U.S. at 482, 92 S.Ct. at 2600.

As the quotation recognizes, although the conditional nature of the parolee's release does not place him at the unfettered mercy of the parole authorities, he is justifiably subjected to restrictions not applicable to the population as a whole. Many of these restrictions relate to matters which the parolee might otherwise be entitled to preserve as private. *See generally* Note, *supra*, 38 N.Y.U.L.Rev. at 720–33. To this extent, therefore, his reasonable expectations of privacy are less than those of other citizens. *Cf.* In re Martinez, 1 Cal.3d 641, 83 Cal.Rptr. 382, fn. 6, 463 P.2d 734; United States v. Biswell, 1972, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87.

■ We think that one of these restrictions, necessary to the effective operation of the parole system, is that the parolee and his home are subject to search by the parole officer when the officer reasonably believes that such search is necessary in the performance of his duties. The parole officer ought to know more about the parolee than anyone else but his family. He is therefore in a better position than anyone else to decide whether a search is necessary. His decision may be based upon specific facts, though they be less than sufficient to sustain a finding of probable cause. It may even be based on a "hunch," arising from what he has learned or observed about the behavior and attitude of the parolee. To grant such powers to the parole officer is not, in our view, unreasonable under the Fourth Amendment. The principal protection against abuse of this authority is the "helping" function of the parole officer's job, and the training that he has received to fit him for that job. A good parole officer does not regard himself as a policeman.

## C. The Warrant Requirement.

California has long held that a parole officer need not obtain a warrant before searching his parolee or his parolee's home. The rule was succinctly stated in People v. Limon, 1967, 255 Cal.App.2d 519, 63 Cal.Rptr. 91, 93, as follows: "Costa, as Limon's parole officer, was entitled to search Limon and his apartment without a search warrant, without Limon's consent and without probable cause." *See also* People v. Taylor, 1968, 266 Cal.App.2d 14, 71 Cal.Rptr. 886.

■ It is now argued that the Fourth Amendment requires that Latta's parole officer should have obtained a warrant before making the search involved in this case, and that his failure to do so makes the search unconstitutional, so that the evidence should have been suppressed. We do not think it appropriate to require that a parole officer obtain a warrant.

As we have seen, the relationship between the parole officer and his parolee is a special one. We find it to be *sui*

*generis* so far as the warrant requirement is concerned. For that reason, we conclude that the propriety of warrantless searches by parole officers pursuant to proper conditions affixed to the status of parole cannot be determined by automatic reference to the law of ordinary search and seizure or to that of administrative searches. It follows that, although the law relating to both ordinary and administrative searches provides some raw material to be considered in framing rules pertaining to parole searches, such searches must be governed by unique, separate, and distinct rules.

Our refusal to impose the warrant requirement departs from the principles applicable to ordinary searches but is consistent with the Supreme Court's refusal to require a warrant in certain types of administrative searches. *See, e. g.*, United States v. Biswell, 1972, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (warrantless but non-forcible search under the Gun Control Act, 18 U.S.C. § 921 et seq., held valid); Colonnade Catering Corp. v. United States, 1970, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (warrantless forcible entry under 26 U.S.C. § 5146(b) is not authorized, but warrantless nonforcible entry would be lawful); Wyman v. James, 1971, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (dictum; warrant not required for home visit by welfare worker). Much of the rationale of the *Wyman* opinion at pp. 322–324, 91 S.Ct. 381 is applicable to the parole officer-parolee relationship. As Mr. Justice Blackmun says (p. 324, 91 S.Ct. at p. 389):

> Of course, the force behind the warrant argument, welcome to the one asserting it, is the fact that it would have to rest upon probable cause, and probable cause in the welfare context, as Mrs. James concedes, requires more than the mere need of the caseworker to see the child in the home and to have assurance that the child is there and is receiving the benefit of the aid that has been authorized for it. In this setting the warrant argument is out of place.

There appear to be several justifications for not requiring a warrant in the foregoing cases. One is the pervasiveness of the regulation to which the person or premises to be searched is subject. As we have seen, the authority of the parole officer is pervasive indeed. Another is the presence of express statutory authorization for a warrantless search. There is no such express statute here, but there is long standing judicial authority in California, and we can perceive no constitutional reason for failing to give weight to that authority. Another is the extent to which a justified expectation of privacy is present. In the case of a parolee, that expectation is severely diminished. Another is the necessity for unannounced and frequent searches, which certainly applies to the parole officer-parolee relationship.

Of great importance is the extent to which the warrant requirement might frustrate the purposes of the search and of the regulatory scheme of which it was a part. The choice frequently has been between dispensing with the warrant requirement altogether or departing from the standard of probable cause in determining the sufficiency of the showing necessary to obtain a warrant. Compare *Biswell, supra,* with Camara v. Municipal Court, 1967, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, and See v. City of Seattle, 1967, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943.

We think it indisputable, in view of the nature of parole and of the parole agent's responsibilities as we have analyzed them, that were a warrant required, the showing necessary to obtain it would have to be substantially different from probable cause to avoid frustrating the purposes of parole. A magistrate required to issue a warrant on the basis of the parole officer's "hunch" serves little or no purpose properly related to the parole system. Whether "founded suspicion" in this context could be more demanding than "hunch" is at best uncertain. The judicial energy that review of the affidavits that these almost gossamer standards would require

can better be spent determining whether the particular search in question was reasonable. We have no desire to reduce the warrant to a paper tiger. Yet that is what we would do if we were to impose a warrant requirement. Because of the necessarily broad nature of the parole officer's authority, in most cases the magistrate would have to take the parole officer's word for it when the parole officer asks for a warrant. This affords no real protection to the parolee; it makes the warrant a mere piece of paper.

This is not to say that we will uphold every search by a parole officer. In a given case, what is done may be so unreasonable as to require that the search be held to violate the Fourth Amendment. For example, harassment or intimidation is no part of a parole officer's job. In short, we do not accept the notion that parole officers may conduct full-blown searches of parolees' homes whenever and as often as they feel like it. To do so would practically gut the principle that parolees are entitled to some privacy. Moreover, it would not advance the goals of the parole system. Indeed, it has been suggested that providing parole authorities with an unlimited power to conduct indiscriminate searches actually undermines the rehabilitation process. Note, Extending Search-and-Seizure Protection to Parolees in California, 22 Stan.L.Rev. 129, 134–35 (1969). Cf. Morrissey v. Brewer, supra, 408 U.S. at 484, 92 S.Ct. 2593. Primary responsibility for seeing that this does not happen, however, rests upon the parole authorities, and, in this case, the California courts, not the federal courts. We have no reason to doubt that the California courts will be vigilant in protecting parolees against unreasonable searches.

D. *The Search in this Case.*

■ Applying these principles to the facts of this case, we readily conclude that the search of Latta's home was not unreasonable in a constitutional sense. His parole officer's interest in inspecting his place of residence did not terminate upon his arrest; if anything, it intensified. Revocation is not a necessary consequence of a parole violation; frequently the parolee merely receives counselling and is released under the same or additional conditions. In making their decision regarding disposition, the parole authorities need to know the number and seriousness of all violations, as well as other current information about the parolee's progress. *See* Morrissey v. Brewer, *supra*, 408 U.S. at 479–80, 92 S.Ct. 2593; R. Dawson, *supra* at 367–74; Note, *supra*, 120 U.Pa.L.Rev. at 342–43, 356–58. When Latta was arrested he was in possession of a small quantity of marijuana. In evaluating this evidence to determine whether Latta was still a good parole risk, it was critical for the parole authorities to know whether he was a regular user of marijuana or other drugs, and if so, whether he was a frequent or casual user, or whether he was engaged in distribution. As California argues, "[p]ossession of narcotics for sale by a parolee threatens both the parole system and the public since such activity is both a violation of parole and a separate crime." (Br. p. 4–5.) It is unlikely that such information could be obtained from outside sources, or that it would be revealed by a brief inspection of Latta's home. *Cf.* R. Dawson, *supra* at 342. Under the circumstances it was not unreasonable for Latta's parole officer to conduct a search.[2]

## II. *Use of the Evidence*

■ Latta's second contention—that, even if the search were valid, the evidence could only be used in a parole revocation hearing—is without merit. As the above discussion demonstrates, Latta's possession of a sizeable quantity of contraband was a matter of legiti-

---

**2.** We express no view about a parole officer's power forcibly to enter a home without a warrant. *Cf.* Colonnade Catering Corp. v. United States, 1970, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60. No forcible entry was made in this case.

mate concern to his parole officer. We have specifically rejected the rule urged by Latta in similar circumstances. *See* United States v. Davis, 9 Cir., 1973, 482 F.2d 893 at 909, n. 44. *See also* United States ex rel. Santos v. New York Bd. of Parole, 2 Cir., 1971, 441 F.2d 1216, 1218. Even when the evidence seized is unrelated to the purpose of the regulatory search, our cases do not support Latta's contention. *See, e. g.,* United States v. Schafer, 9 Cir., 1972, 461 F.2d 856. *See also* United States v. Biswell, *supra.*

Affirmed.

EUGENE A. WRIGHT, Circuit Judge, joined by CHAMBERS and WALLACE, Circuit Judges, concurring:

I concur in the holding that the search here was reasonable, not oppressive or harassing, and that there should be no requirement that a parole officer obtain a warrant to search his parolee or the parolee's home. I note, too, that the majority believes that "A good parole officer does not regard himself as a policeman." Majority op. at 250. In my dissenting opinion in United States v. Consuelo-Gonzalez, 521 F.2d 268 (9th Cir. 1975), I made the same observation as to probation officers and their role and relationship vis-à-vis probationers.

But I have some doubt about the majority's observation that "the parole officer ought to know more about the parolee than anyone else but his family. He is therefore in a better position than anyone else to decide whether a search is necessary." Majority op. at 250. The majority also assumes that much of the information about parolees comes from interviews and home visits. *Id.* at 249–250.

As my dissent in *Consuelo-Gonzalez* attempted to make clear, in many instances such extensive contact between probationers and parolees and their supervisors is untenable. In those cases as well as others, those best able to decide whether a search is necessary are law enforcement personnel. Town marshals, city police, sheriffs and state and federal law enforcement officers will often have made observations and reports that

would provide a parole officer with the basis for making his decision to search, and be in the best position to advise him when and how to do so effectively and safely.

The majority suggests that there would be something improper about a parole officer searching at the suggestion of the police. Who would be in a better position to suggest it? The majority recognizes the need to prevent further "antisocial or criminal conduct by the parolee" and, surely, law enforcement personnel would have as much concern for those ends as would a parole officer.

In actual practice, parole and probation officers don't ordinarily have to proceed on the basis of "hunches." Rather, they act on reliable information from agencies which are set up for that purpose.

CHOY, Circuit Judge, joined by MERRILL, Circuit Judge, concurring.

I fully concur in the majority opinion except as to the dicta at pages 250 and 251–252 voicing this court's approbation of mere *hunch* as a basis of reasonable belief for a warrantless search by a parole officer of a parolee's home and person. Hunch carries with it a license to abuse; it gives a parole officer *carte blanche* to make such searches.

I am concerned about the liberality with which parole officers and the district courts may apply "hunch" as used in the foregoing opinion. I would prefer that that language be omitted. That would leave the opinion saying, as it otherwise does, that a parolee and his home are subject to search by the parole officer when the officer reasonably believes that such search is necessary in the performance of his duties and that his decision to search may be based upon specific facts though they be less than sufficient to sustain a finding of probable cause.

Hunch was not the basis for Latta's arrest by his parole officer who knew that Latta was violating a condition of his parole by associating with known ex-

convicts. When arrested, Latta held a pipe containing marijuana. On these facts the parole officer formed a reasonable belief that a search of Latta's home, if only for the marijuana, was necessary. There is no need for the majority opinion to speak of hunch.

HUFSTEDLER, Circuit Judge, with whom BROWNING and ELY, Circuit Judges, join, dissenting:

The majority of the court and I agree on many points in the analysis of the legality of this search: The Fourth Amendment governs parole searches; older authorities excluding parolees from the Fourth Amendment's protection against unreasonable searches and seizures are constitutionally defunct.[1] A parolee has a legitimate expectation of privacy, although his expectation is not the same as that of other citizens who are not enmeshed in the parole system. In his dealings with law enforcement personnel other than his parole officer, a parolee is entitled to the same expectation of privacy as a wholly free citizen, but the parolee cannot expect the same privacy bulwark to be erected between him and his parole officer. To exercise his responsibilities of supervision, a parole officer must have considerable latitude in observing the parolee in and out of his home and, under some circumstances, he must be able to search the parolee's person and home. However, I cannot agree with the majority that a parole officer may search his parolee's home without probable cause and without a warrant, subject only to the restriction that the ensuing search, from a hindsight view, does not appear unreasonable to parole authorities or to the courts when criminal proceedings are instituted against the parolee.

The majority offers three intertwined justifications for jettisoning the warrant requirement: (1) the probable cause component of the warrant procedure cannot be applied without reducing war-

rants to useless formalities or seriously impairing effective parole supervision; (2) the parole officer's relationship to the parolee is an adequate substitute for a warrant because the officer's intimate knowledge of the parolee, his training in rehabilitative techniques, his concern for the well-being of his charge, and his unusual intuitive capacity will deter unreasonable searches; and (3) even if a parole officer conducts an unreasonable search, subsequent review by higher parole authorities or by the courts will protect the parolee from the consequences of such a search and will deter future unreasonable searches.

The majority's conclusion that applying the warrant requirement necessitates a choice between unduly impairing the concept of probable cause and unduly impairing the parole officer's functions reflects a fundamental misunderstanding of probable cause. The concept of probable cause is not rigid. It is flexible enough to be adapted to parole searches to give the parolee meaningful protection and to preserve the functions of parole. If the question were whether to adapt the warrant requirement as the general rule, rather than as an exception to it, and if the only alternatives in enforcing the warrant procedure were those assumed, the majority's rationale would be forceful, although not necessarily convincing; but that is not the question, and those are not the only choices.

A warrantless search is per se unreasonable, " 'subject only to a few specifically established and well-delineated exceptions.' " (Schneckloth v. Bustamonte (1973) 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854; United States v. United States District Court (1972) 407 U.S. 297, 315, 92 S.Ct. 2125, 32 L.Ed.2d 752; Camara v. Municipal Court (1967) 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930; Jones v. United States (1958) 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514.)[2] The majority fails to confront this basic proposition. It as-

1. Op'n, Duniway, J., at 248–249.

2. For a synoptical discussion of exceptions to the warrant requirement, *see* Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn.L.Rev. 349, 358–60 (1974) and accompanying notes.

sumes that the test is whether the search itself is reasonable—an interpretation flatly rejected by the Supreme Court when it overturned United States v. Rabinowitz (1950) 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (United States v. United States District Court, *supra*, 407 U.S. at 315–16, 92 S.Ct. 2125). The test underlying the few exceptions to the per se rule is whether it was reasonable to procure a search warrant.

Although the Fourth Amendment requires a warrant to search, it does not dictate that the probable cause necessary to justify issuance of a warrant to a parole officer to search his parolee's home must be the same as that governing issuance of a warrant to a policeman to search a home. Probable cause, together with its evidentiary underpinnings, is not and cannot be inflexible. (*Cf.* Camara v. Municipal Court, *supra*; Almeida-Sanchez v. United States (1973) 413 U.S. 266, 283–84, 93 S.Ct. 2535, 37 L.Ed.2d 596 (Powell, J., concurring).) Conceptual rigidity would destroy the living force of the Fourth Amendment by disabling it from meeting new challenges that arise from changing conditions.[3]

The organic quality of the probable cause requirement is reflected by the developing law controlling administrative searches. In Camara v. Municipal Court, *supra*, the Supreme Court adhered to the warrant requirement but declined to limit the showing of antecedent justification to probable cause to believe "that a particular dwelling contains violations of the minimum standards prescribed by the code being enforced" (387 U.S. at 534, 87 S.Ct. at 1734), holding instead that probable cause could be established on an area-wide basis when "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building . . or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling" (387 U.S. at 538, 87 S.Ct. at 1736). The Court expressly rejected the contention that modification of the probable cause standard to meet the problem arising from this type of administrative search would authorize " 'a synthetic search warrant' . . . . If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant. . . . Such an approach neither endangers time-honored doctrines applicable to criminal investigations nor makes a nullity of the probable cause requirement in this area." (387 U.S. at 538–39, 87 S.Ct. at 1736.)

The Supreme Court has permitted warrantless administrative searches in a single context under severely limiting circumstances. An administrative search may be made of business premises of licensed dealers in liquor or firearms pursuant to statute or ordinance supported by sufficiently detailed regulations so far describing the dealer's obligations and defining the inspector's authority that neither inspector nor dealer is "left to wonder about the purposes of the inspector or the limits of his task." (United States v. Biswell (1972) 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87; Colonnade Catering Corp. v. United States (1970) 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60.)

The majority's effort to squeeze parole searches into the *Biswell-Colonnade* mold and out of *Camara-See's*,[4] distorts both sets of opinions.[5] No statutory authority for parole searches exists here, and there are no regulations of any kind defining

---

3. Parole is one such changing condition. Parole began over a century after the Fourth Amendment was drafted, when in 1876 the Elmira Reformatory in New York commenced the practice. (National Advisory Commission on Criminal Justice Standards and Goals, Corrections 391 (1973).)

4. See v. Seattle (1967) 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943.

5. The limitations of the *Biswell-Colonnade* exception to the warrant requirement are sharply drawn by Almeida-Sanchez v. United States (1973) 413 U.S. 266, 270–72, 93 S.Ct. 2535, 37 L.Ed.2d 596.

the limits of the parole officer's authority or the scope of the searches he may make. The suggestion is untenable that appellate court decisions in the realm of search and seizure are an adequate substitute for the statutes and regulations that *Biswell* and *Colonnade* require. Appellate court decisions on points of search and seizure law are not susceptible to neat categorization, involving as they do endless twists of facts and circumstances viewed always retrospectively and almost always after a search has turned up something incriminating. The assumption is wholly unrealistic that appellate opinions, incorporated by reference into a parole officer's hypothetical manual of standard operating procedures would provide any black-letter directions governing future interactions between parole officers and their parolees.

Wyman v. James (1971) 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 sharply distinguishes home visits from searches;[6] it cannot be used to turn a search into a home visit. As *Wyman* takes pains to point out, *Camara* and *See* are "significantly different" because those cases "arose in a criminal context where a genuine search was denied and prosecution followed" (400 U.S. at 325, 91 S.Ct. at 390). The instant case arose in a criminal context where a genuine search was made and prosecution followed.

Our decision in United States v. Davis (9th Cir. 1973) 482 F.2d 893, upholding warrantless airport search programs, suggests a helpful analytical framework for determining whether an administrative search can be conducted without a warrant. The court took the following factors into account: (1) airport searches are conducted as part of "a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a regular criminal investigation to secure evidence of crime" (482 F.2d at 908); (2) the decision to search a particular passenger's luggage "is not 'subject

to the discretion of the official in the field'" (482 F.2d at 910); (3) a warrant requirement would effectively frustrate the governmental purpose behind the search; (4) the public has a very substantial interest in preventing skyjacking; and (5) a warrantless search is nevertheless unreasonable if it is unnecessarily intrusive (undue intrusiveness is avoided if a passenger can prevent a search by electing not to board the plane).

The parole system is a regulatory scheme embodying both rehabilitative and crime prevention components, in each of which the public has a very substantial interest. However, searches of the parolee's home are not a necessary ingredient of every parolee's supervision, nor are such searches the subject of promulgated regulations. The decision to search, absent a warrant, rests on the parole officer's discretion. Unlike the airline passenger, the parolee is not given a choice whether to submit to a search. Undoubtedly there are occasions when a parole officer must search his charge's home to fulfill the purposes of the parole system. But the majority opinion fails to explain (1) why the power to search should not be confined to those cases in which less intrusive means will not adequately serve the public interest in parole supervision, or (2) why the appropriate method of determining whether a search shall be made and how extensive it shall be should not be a warrant procedure. When probable cause is adapted to the special circumstances of parole, the warrant requirement fulfills constitutional mandates without unreasonably restricting parole supervision.

A warrant should issue to a parole officer to search his parolee's residence upon the officer's showing that the described home to be searched is the residence of his parolee, in which he lives alone or in the company of persons identified or otherwise described; that the

---

**6.** "This natural and quite proper protective attitude, however, is not a factor in this case, for the seemingly obvious and simple reason that we are not concerned here with any search by the New York social service agency in the Fourth Amendment meaning of that term." (Wyman v. James, *supra*, 400 U.S. at 317, 91 S.Ct. at 386.)

parole officer has reasonable cause to believe that the parolee is violating, or is in imminent danger of violating, one or more specified conditions of his parole; and that he has reasonable cause to believe that evidence of such actual or impending violations will be found in the home to be searched. Evidentiary support for the probable cause showing need not meet the high standards of *Aguilar-Spinelli*,[7] but it could not be based on the officer's hunches unsupported by articulated facts. Rather, the standard should be sufficiently flexible to accommodate the parole officer's supervisory obligations, but not so loose as to offer the parolee and his family no protection from arbitrary intrusions by the parole officer or from searches that are unjustifiably broad. To this end, the officer's showing need not be confined to evidence admissible in a courtroom. It could even include information from others whose reliability had not been tested.

In deciding whether to issue the warrant and in defining its terms, the magistrate would take into account the strength of the showing of reasonable cause and such additional factors as the nature of the parole violations suspected, the extent to which persons other than the parolee would have their privacy invaded by the search, and the existence of means less intrusive than the search to meet the parole officer's supervisory responsibilities.

The issuance of a warrant on this kind of showing is no "paper tiger";[8] neither is it an undue burden on the functioning of parole. Even if we were to assume, as does the majority, that "in most cases the magistrate would have to take the

parole's officer's word for it,"[9] which I interpret as referring to the factual recitals of the parole officer, the protection afforded by the warrant is by no means negligible. The requirement that an officer articulate his reasons for making a search before he searches is a substantial deterrent to impulsive and arbitrary official conduct and a real safeguard against after-the-fact justifications. (*See* Greenberg, "The Balance of Interests Theory and the Fourth Amendment," 61 Calif. L.Rev. 1011, 1025 n.60 (1973).)[10]

Moreover, the assumption is dubious at best that magistrates "in most cases" will exercise no independent judgment in issuing search warrants to parole officers. A neutral magistrate is not and should not be assumed to be an automaton. " '[T]he procedure of antecedent justification . . . is central to the Fourth Amendment' " (Katz v. United States (1967) 389 U.S. 347, 359, 88 S.Ct. 507, 515, 19 L.Ed.2d 576). "The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised" (United States v. United States District Court, *supra*, 407 U.S. at 317, 92 S.Ct. at 2137 (footnote omitted).)

Post search reviews of reasonableness neither deter unreasonable searches nor remedy those that have occurred. In all but the most egregious cases, the searching officers will be able retrospectively to point to specific facts that justified the search. (Beck v. Ohio (1964) 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142; *see* United States v. United States District Court, *supra*, 407 U.S. at 317–18, 92 S.Ct. 2125.) Unreasonable searches that yield nothing incriminating do not sur-

---

7. Aguilar v. Texas (1964) 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; Spinelli v. United States (1969) 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637.

8. To the majority's charge that I would create a "paper tiger" (*ante* at 252), I might reply that the majority's sentinel of privacy is a Cheshire kitten that dematerializes with the first glimmer of a parole officer's incipient hunch. But the differences between us are much deeper than a metaphorical debate.

9. Op'n, Duniway, J., at 252.

10. "Harassment is not confined to inspections motivated solely by personal spite and bad faith, but includes overzealous enforcement. The latter problem is considerably more acute . . . [where] one of the main aims of the inspection scheme is to 'serve as a credible deterrent.' Government use of the search power to deter, unchecked by neutral inquiry into the necessity for a given level of deterrence, creates the possibility of substantial abuse, since it is undeniable that the greater the governmental abuse, the greater the deterrent effect." (Greenberg, *supra*, 61 Calif.L. Rev. at 1023 (footnote omitted).)

face in parole review proceedings or in the criminal courts, and it will be a very brave or very foolhardy parolee who attempts to vindicate his Fourth Amendment rights by suing his parole officer pursuant to 42 U.S.C. § 1983 and Bivens v. Six Unknown Named Agents of Federal Bureau of Investigation (1971) 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619— even if he has the financial wherewithal to do so.[11] Furthermore, review by parole authorities or criminal courts provide no protection and no solace to the parolee's family and friends whose privacy is invaded by unreasonable searches of the parolee's home or temporary abode, which they may share with him.

The majority's reliance upon the expertise of parole officers and their supposed knowledge of the standards of reasonableness developed in numerous decisions of appellate courts is misplaced. Of course, there are parole officers who maintain ideal relationships with parolees and who are well trained in the rehabilitative arts. There may even be parole officers who keep up with advance sheets. But surely they are not representative of the mine run of parole officers. "In a number of parole systems, too many parole officers still see their major role as that of policeman-enforcer." (National Advisory Commission on Criminal Justice Standards and Goals, Corrections 434 (1973).) Parole systems are more often than not characterized by inadequate training programs and by individual workloads so burdensome that parole officers, no matter how well trained and dedicated, cannot function effectively. (*Id.* at 435.) To the extent that there is a check on unreasonable searches, it is more attributable to case overload than to a regard for Fourth Amendment values; parole officers simply do not have enough time to search many of their parolees' homes.[12]

The rehabilitative goals of parole would be advanced, not impeded, by a warrant requirement. As the majority concedes, indiscriminate searches undermine the rehabilitative process. The Constitution places primary responsibility for preventing indiscriminate searches on the warrant requirement and not, as the majority concludes, on the parole authorities or the courts in later criminal proceedings.

The warrant requirement does not deprive the parole officer of any legitimate tool that he needs to practice his craft. He needs no warrant to visit his charge's home. (*Cf.* Wyman v. James, *supra.*) If during the course of a home visit and without a search a parole officer observes evidence leading him reasonably to believe that his parolee is in violation of the conditions of parole, he may seize that evidence. His observations during a home visit could provide probable cause to search the residence forthwith, if the circumstances appear exigent. In short, the parole officer has all the leeway to conduct a warrantless search that is accorded a police officer, with the substantial advantage that the parole officer, unlike a policeman, can gain warrantless entry for visiting purposes.

The need for a warrant is vividly demonstrated by the facts of the case before us. At the time the parole officer, accompanied by a police officer, searched the parolee's residence, the parolee was in custody. Violation of his parole had theretofore been established. No exigent circumstances existed justifying any immediate search. The only purpose served was to gather evidence of crime. The search invaded the privacy of the

---

11. *Cf.* Amsterdam, *supra* note 2, 58 Minn.L. Rev. at 429 n. 30.

12. The warrant procedure would mitigate the possibility that a particular search would be "based on caprice or on personal . . . spite" (Ohio ex rel. Eaton v. Price (1960) 364 U.S. 263, 271, 80 S.Ct. 1463, 1468, 4 L.Ed.2d 1708 (Brennan, J.)) or that "the adminis-

trative officer who invades the privacy of the home may be only a front for the police who are thus saved the nuisance of getting a warrant" (Abel v. United States (1960) 362 U.S. 217, 242, 80 S.Ct. 683, 699, 4 L.Ed.2d 668 (Douglas, J., dissenting)).

parolee's family as well as that of the parolee. No function of parole would have been impeded or embarrassed by requiring the parole officer to procure a warrant. The search falls squarely within the Fourth Amendment prohibition of unreasonable searches.

The majority opinion says that post-search review of the reasonableness of the search is an adequate substitute for a warrant. The unsoundness of that conclusion is illustrated by the majority's application of its rule to uphold the search in this case. The search would have been patently unreasonable, as the majority tacitly concedes, if it had been made by a lone policeman. It becomes reasonable solely by virtue of the fact that it was made by a parole officer, accompanied by a police officer. The unarticulated majority rule is that all searches of a parolee's home by his parole officer are reasonable unless the particular search later is deemed to have been harassing, or intimidating, or too overblown. In short, the majority creates a presumption of reasonableness in respect of searches by parole officers, to be dispelled, if ever, upon subsequent review of a particular search. Under a warrant requirement, the burden would be on the government official to establish the reasonableness of the prospective search. Under the majority's rule, the parolee has the burden of establishing the unreasonableness of the search. Since the parolee would have to establish unreasonableness after a search has presumably turned up something incriminating, his burden is practically insurmountable. How can the majority's reasoning be squared with its conclusion that its reasonableness standard is an acceptable substitute for a warrant? The impact of the majority's rule is to obliterate Fourth Amendment protections of a parolee from unreasonable searches and seizures by his parole officer.

The warrant requirement must not be unjustifiably and easily cast aside. We should be ever mindful of the truth and wisdom of Mr. Justice Frankfurter's observation: "The history of liberty has largely been the history of observance of procedural safeguards." (McNabb v. United States (1943) 318 U.S. 332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819.)

I would reverse.