**UNITED STATES of America**

**v.**

**Peter REA, Defendant.**

**No. 79 CR 605.**

United States District Court,
E. D. New York.

Sept. 16, 1981.

428

Edward R. Korman, U. S. Atty., E. D. New York, Brooklyn, N. Y. by Leonard Rosenblatt, Asst. U. S. Atty., Brooklyn, N. Y., for the U. S.

The Legal Aid Soc. Federal Defenders Services Unit by Thomas Concannon, New York City, for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

On December 11, 1979, Peter Rea pleaded guilty before this Court to a charge of conspiracy to deal in firearms without a license. On February 20, 1980, the Court suspended the imposition of sentence and placed Rea on probation for a term of three years. At that time Rea promised to abide by the conditions of probation, reproduced as Appendix A, with the understanding that a violation of any of them during the probationary period could result in the revocation of probation and incarceration.

On May 29, 1981, Rea was arrested by his United States Probation Officer, Christopher Swords. On June 4, 1981, the Court held a hearing on the government's application to revoke Rea's probation based on alleged violations of two conditions of his probation.[1] Rea's counsel contends that for the purposes of determining whether a violation has occurred, the Court may not consider certain evidence presented by the government because it had been obtained in violation of Rea's constitutional rights. For the reasons which follow, the Court rejects Rea's contention and finds that he has violated the conditions of his probation.

At the revocation hearing, Swords testified that on May 26, 1981, an anonymous caller telephoned and stated that he had information about Rea.[2] Specifically, the caller alleged that Rea was in possession of cocaine; that he was in possession of forged baptismal certificates; that he had left the Eastern District of New York and had travelled to Washington, D. C., without the permission of his probation officer; that he was involved in a conspiracy to defraud by making false claims with regard to American Express Travelers checks; and that he had been in an automobile accident the previous week.

Swords independently verified through the New York City Police Department that Rea had in fact been involved in such an accident and had also been questioned by an officer of the 106th precinct. Swords further ascertained from an investigator with the American Express Travel Service that such a conspiracy involving Rea was suspected and an investigation by the company was being initiated. Swords testified that neither he nor anyone else in the Probation Department had been informed that Rea had taken a trip outside of the Eastern District, nor that he had been in an auto accident and had been questioned by a policeman.

---

1. Following the hearing, Rea was continued on bail pending the Court's determination of this matter.

2. The identity of the caller was never ascertained by Swords, although the American Express investigator told Swords that he, too, had received an anonymous tip about Rea, apparently from the same person.

On May 29, 1981, Swords and three other probation officers went to Rea's residence in Queens, New York. Swords and one other officer rang the doorbell and were met by Camille DeLucia, Rea's common law wife. While still in the hallway, Swords identified himself and DeLucia allowed the two officers into the apartment. Rea joined them and after a few moments conversation, Swords asked him about his automobile, which had previously been impounded. Rea stated nothing was new and then said, in an "offhand" manner, that he had been "in a minor accident the other night." Swords then confronted him with the information he had received and reminded Rea of his obligation, as a condition of probation, to report immediately any time he was questioned by any law enforcement officer. Swords stated that he had reasonable cause to believe that Rea was in violation of probation for failure to report the incident.

Swords then asked Rea and DeLucia if they had any objection to the officers looking around the apartment. When both promptly responded that they had no objection, Swords sent for the other two probation officers, who had been waiting outside in a car. When Swords introduced the two officers to Rea and DeLucia, the latter suddenly stated that they did not want the officers to search the apartment. When DeLucia appeared to become upset, Swords suggested to Rea that he convince her to leave the apartment, as the officers did not want to further upset her and they did not believe the search would involve her.

After DeLucia departed, but before any search occurred, Swords told Rea the substance of the information he had received from the anonymous caller and asked about the forged baptismal certificates. Rea admitted that he had some, went to get them and handed them over to one of the officers. Thereafter, as Swords and Rea sat at the dining room table, the three officers searched the apartment. The apartment was not disrupted and the officers completed the search before 3:00 p. m., the time Rea had informed them children would return to the apartment.

While the search was being conducted, Swords asked Rea whether or not he had left the Eastern District. When Rea responded that he wished to speak with an attorney before he made any statement regarding a trip, Swords changed the topic and asked about the baptismal certificates. Rea answered that they had been given to him by a friend but that he could not identify the friend. Swords then asked about the allegations of fraud with regard to the American Express travelers checks. Rea admitted that he had participated in such a scheme and provided information as to another participant. In the course of this discussion, Rea stated that earlier that month he had traveled with DeLucia and two others to Washington, D.C., for the purpose of cashing travelers checks.

The search of Rea's apartment uncovered a loaded .25 caliber pistol, rounds of ammunition and accessories for that and other handguns, tear gas pellets, an illegal stiletto knife, four ounces of marijuana, assorted drug paraphernalia and cutting solutions, and several blank baptismal certificates. Pursuant to department policy, Swords telephoned his supervisor and received authorization to arrest Rea on the basis of his statements and the items recovered in the apartment.

It is Rea's contention that the probation officers could not search his apartment without previously obtaining a valid search warrant. In the absence of such a warrant, and since he had withdrawn his earlier consent to search, Rea argues that the evidence must be suppressed for purposes of this probation revocation proceeding.[3]

The question whether a warrant is required to search the home of a probationer implicates special considerations arising out

---

3. Rea concedes that the probation officer had a right, as part of his special relationship to his probationer, to make unannounced home visits. Nor is it disputed here that consent to enter the apartment was freely given and never revoked.

In addition, we note the statutory authorization for a probation officer to arrest a probationer for cause at any time without a warrant. 18 U.S.C. § 3653.

of the peculiar status of those who, by the grace of the sentencing judge, have been permitted to serve their sentences outside of jail. Only two Circuits appear to have addressed the question directly and they have arrived at opposite conclusions. Compare *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir.) (*en banc*), *cert. denied*, 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975) (probationer's home may be searched without a warrant on an officer's informed "hunch"), with *United States v. Bradley*, 571 F.2d 787 (4th Cir. 1978) (conviction for firearms possession reversed where parole officers had seized gun in warrantless search of parolee's room).

▆▆ Probationers, whose status for these purposes is "constitutionally indistinguishable" from that of parolees, *Gagnon v. Scarpelli*, 411 U.S. 778, 782 n.3, 93 S.Ct. 1756, 1759 n.3, 36 L.Ed.2d 656 (1973),

> "are neither totally stripped of nor fully invested with constitutional protections. They are different from other citizens and they may, in certain circumstances, possess fewer constitutional rights. This difference in status and protection is based on the fact that [probationers] have been convicted of a crime and are still serving their sentence while on [probation], albeit not within prison walls."

*United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978). As a precondition to the enjoyment of this special status, convicted criminals must enter into a unique relationship with probation officers who, like parole officers,

> "are part of the administrative system designed to assist [probationers] and offer them guidance. The conditions of parole

serve a dual purpose; they prohibit, either absolutely or conditionally, behavior that is deemed dangerous to the restoration of the individual into normal society. And through the requirement of reporting to the [probation] officer and seeking guidance and permission before doing many things, the officer is provided with information about the [probationer] and an opportunity to advise him."

*Morrissey v. Brewer*, 408 U.S. 471, 478, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972). See *Gagnon v. Scarpelli, supra*, 411 U.S. at 783, 93 S.Ct. at 1760. Accordingly, the probation officer "has been entrusted traditionally with broad discretion to judge the progress of rehabilitation in individual cases," *id.* at 784, 93 S.Ct. at 1760, and a probationer's reasonable expectation of privacy, particularly with regard to the supervisory responsibilities of his probation officer, are less than those of other citizens. *Latta v. Fitzharris, supra*, 521 F.2d at 250.

With these considerations in mind, since we believe that the relationship between the probation officer and his probationer is "*sui generis* so far as the warrant requirement is concerned," *id.* at 250–51, we are inclined to agree with the view of the Ninth Circuit and would hold in this case that a warrant was not required prior to the search of Rea's apartment.[4]

▆▆ However, in the context of this proceeding, the Court is of opinion that this question need not be resolved. We are not presented here, as were the Courts in *Latta* and *Bradley, supra*, with a separate criminal prosecution based on evidence obtained through a warrantless search of the home

---

4. We observe that Swords had much more than a "hunch" to support his search of Rea's apartment. The informant had provided detailed information that was corroborated by at least two independent and reliable sources. This "satisfactory evidence," see *United States v. Polito*, 583 F.2d 48, 52 (2d Cir. 1978), and also *United States v. Basso*, 632 F.2d 1007, 1013 (2d Cir. 1980), gave Swords a reasonable basis to believe that the apartment may have contained evidence of Rea's violation of his conditions of probation. See *Latta v. Fitzharris*, 521 F.2d

246, 253–54 (9th Cir.) (Choy, J., concurring), *cert. denied*, 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975). In addition, there is no question here of a forcible entry into the apartment or of any unreasonably disruptive search. The probation officers were armed, but apparently never displayed their weapons. They showed consideration and restraint in suggesting the departure of Rea's wife, even though they presumably knew that she had been his codefendant and was also a probationer under supervision.

of a parolee or probationer.[5] The items found in Rea's apartment are being offered solely to support an application to revoke probation. As such, since the exclusionary rule is not applicable in a proceeding to revoke parole or probation, *United States ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161 (2d Cir. 1970); *United States v. Delago,* 397 F.Supp. 708 (S.D.N.Y.1974); see cases collected in *United States v. Frederickson,* 581 F.2d 711 (8th Cir. 1978), the Court will consider the evidence found in Rea's apartment.

■ Because a probation revocation hearing is not an adversarial proceeding— indeed, the probationer has already been convicted and sentenced under the full panoply of constitutional protections—to apply the exclusionary rule in such a context would tend to obstruct the remedial and rehabilitative purposes of the probation system. See *United States ex rel. Sperling v. Fitzpatrick, supra,* at 1163–64. "There is no need for a double application of the exclusionary rule," *id.,* and if Rea is correct in his contention that a warrant was required, he will be protected in any criminal prosecution that may be brought against him based on the items found in his apartment.

■ Moreover, not applying the exclusionary rule in this context does not leave probationers unprotected against untoward conduct on the part of their probation officers. Harassment of probationers can be remedied by civil actions for injunctive relief or monetary damages. See *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *United States v. Basso,* 632 F.2d 1007, 1012 n.4 (2d Cir. 1980). See also *Diaz v. Ward,* 506 F.Supp. 226 (S.D.N.Y.1980), appeal dismissed by unpublished order February 19, 1981. Instances of abuse of the latitude afforded probation officers can be treated

as they arise. See *Abel v. United States,* 362 U.S. 217, 240, 80 S.Ct. 683, 697, 4 L.Ed.2d 668 (1960).

■ Accordingly, since the Court is of opinion that Swords' search was sufficiently justified by the information he had received, even if there existed a requirement that he obtain a warrant beforehand, his failure to do so does not require in this proceeding the exclusion of the evidence obtained in the search of Rea's apartment.

■ Secondly, Rea contends that the Court must also suppress all statements that he made after he said he wished to speak to an attorney before responding to the question about leaving the Eastern District. However, for the reasons set forth above, we are of opinion that Rea's special status as a probationer also precludes him from claiming the full panoply of Fifth Amendment protections available to other citizens.[6]

Rea was granted probation on the understanding that he submit to the supervision of a probation officer and cooperate in that officer's efforts to monitor his hoped-for rehabilitation. More specifically, Rea expressly promised to comply with the direction:

"You shall report to the probation officer as directed."

As Judge Frankel has said:

"The requirement to report, to account, is centrally and necessarily implied in the probationer's status. It may not be avoided by the claim of a privilege which must be held unavailable because it is fundamentally inconsistent with the acquisition and maintenance of probationary status."

*United States v. Manfredonia,* 341 F.Supp. 790, 795 (S.D.N.Y.), *aff'd per curiam,* 459

---

**5.** See also *United States v. Dally,* 606 F.2d 861 (9th Cir. 1979); *United States v. Consuelo-Gonzalez,* 521 F.2d 259 (9th Cir. 1975).

**6.** We are not presented here with Sixth Amendment issues since a probationer's right to counsel does not attach until after his arrest and until his probation "status might imminently be discontinued." *United States ex rel. Bey v.*

*Connecticut State Board of Parole,* 443 F.2d 1079, 1088–89 (2d Cir.), *vacated as moot,* 404 U.S. 879, 92 S.Ct. 196, 30 L.Ed.2d 159 (1971). Even at that point, because of the special nature of the revocation hearing, the probationer does not enjoy the full right to counsel he had in his criminal proceedings. *Id.*

F.2d 1392 (2d Cir.), *cert. denied*, 409 U.S. 851, 93 S.Ct. 61, 34 L.Ed.2d 93 (1972).

▇ Since the privilege against self-incrimination was not available to Rea in the face of inquiries by his probation officer, we cannot see how his request for an attorney with regard to a particular question could activate the same considerations that would require police officers to refrain from all further questioning of an ordinary citizen who has requested an attorney. *Cf. Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Moreover, as soon as Rea said he did not want to speak about leaving the Eastern District, Swords went on to other topics and Rea willingly continued the conversation. It was only later, as Rea was freely explaining his involvement in the alleged travelers checks scheme, that the probationer himself brought up the subject again and admitted traveling to Washington, D.C. Under these circumstances, the Court is of opinion that this admission may be considered in this probation revocation proceeding.[7]

Accordingly, on the basis of the evidence adduced at the revocation hearing, the Court finds that Rea has violated the conditions of his probation in that:

(1) He was found on May 29, 1981, in illegal possession of a loaded .25 caliber revolver;

(2) He was questioned by a New York City police officer on May 21, 1981, and did not notify his probation officer of the incident until confronted with this information;

(3) He left the Eastern District of New York and traveled with others to Washington, D.C., on May 7, 1981, without notifying or receiving permission from his probation officer.

The petition for revocation of probation is granted. Probationer is directed to appear for sentence, the imposition of which has heretofore been suspended, in Courtroom 2,

United States Courthouse, Brooklyn, N.Y., on Friday, October 9, 1981, at 10:00 a. m.

SO ORDERED.

## APPENDIX A

### CONDITIONS OF PROBATION

It is the order of the Court that you shall comply with the following conditions of probation:

(1) You shall refrain from violation of any law (federal, state, and local). You shall get in touch immediately with your probation officer if arrested or questioned by a law-enforcement officer.

(2) You shall associate only with law-abiding persons and maintain reasonable hours.

(3) You shall work regularly at a lawful occupation and support your legal dependents, if any, to the best of your ability. When out of work you shall notify your probation officer at once. You shall consult him prior to job changes.

(4) You shall not leave the judicial district without permission of the probation officer.

(5) You shall notify your probation officer immediately of any change in your place of residence.

(6) You shall follow the probation officer's instructions.

(7) You shall report to the probation officer as directed.

The special conditions ordered by the Court are as follows:

**Ct. 1—Imposition of sentence suspended, probation 3 years.**

I understand that the Court may change the conditions of probation, reduce or extend the period of probation, and at any time during the probation period or within the maximum probation period of 5 years permitted by law, may issue a warrant and revoke probation for a violation occurring during the probation period.

---

7. In addition, the Court notes that the rule in *United States ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161 (2d Cir. 1970), making the exclusionary rule inapplicable in probation revocation proceedings, has also been applied to oral statements. *United States v. Delago*, 397 F.Supp. 708, 712 & n.2 (S.D.N.Y.1974).

I have read or had read to me the above conditions of probation. I fully understand them and I will abide by them.

(Signed) <u>Peter Rea</u>    2–15–80
   Probationer    Date