STATE of Utah, Plaintiff and
Respondent,

v.

Ernest Joe VELASQUEZ, Defendant
and Appellant.

No. 17242.

Supreme Court of Utah.

Oct. 25, 1983.

Lynn R. Brown of Salt Lake Legal Defender Assn., Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Robert N. Parrish, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

Defendant was convicted of second degree murder. On this appeal he urges that the judgment of conviction must be set aside because the verdict was based on evidence obtained by a search and seizure in violation of the Fourth Amendment to the United States Constitution. Specifically, the contention is that the evidence seized by parole officers in defendant's apartment should have been suppressed because the parole officers had failed to obtain a search warrant. Defendant also asserts that other alleged errors in the trial of the case, whether viewed individually or together, deprived him of a fair trial.

The defendant, Ernest Velasquez, was a parolee. On September 10, 1979, he informed Agent Roger Harris of the Utah Adult Probation and Parole Department that he had moved to Utah, and requested that parole supervision be transferred from New Mexico to Utah. Harris apparently contacted New Mexico authorities, and in October a transfer agreement was entered into pursuant to an interstate compact, which transferred parole supervision over Velasquez to Utah. *See generally* U.C.A., 1953, § 77–62–39. Although the practice of Utah parole authorities is to require parolees transferred from other states to sign a Utah parole agreement, the record does not indicate that Velasquez did so.

On November 21, 1979, the victim of the murder, Richard Whitehead, was found dead by his brother Paul Whitehead in an apartment adjacent to the defendant's. Paul had been trying to contact Richard since November 19 when he had been notified by Richard's employer that Richard had failed to show up for work. When Paul gained entry into his brother's apartment, he found Richard lying on his bed, dead and covered with blood. He had a lamp cord around his neck and a gunshot wound through his eye. In addition, there were several abrasions on his forehead, which, according to the medical examiner, were probably caused by a blunt instrument. A piece of wood and a spent .22 caliber shell were found at the scene.

On November 26, in the usual course of an investigation of defendant pursuant to the transfer agreement, Parole Agent Harris visited the defendant at his apartment. Harris noticed that the defendant was violating parole rules by living with another parolee, Jessie Garcia; that neither parolee had a regular job; and that two juvenile females were living with Velasquez and Garcia.

Immediately after the visit, Harris told the police department that the defendant was a parolee. In the initial investigation of Whitehead's murder, the police were unaware of the parolee status of Velasquez and had ruled him out as a murder suspect. Harris also told Agent Robert Poulton, who was assigned to supervise Jessie Garcia, that the defendant and Garcia were living together. The next day, November 27, a police officer informed Poulton that a police informant had indicated that Garcia had offered to sell cocaine to the informant. Poulton had previously heard that Garcia was dealing in drugs. Poulton was also concerned because the prison psychiatrist and a psychologist treating Garcia had told

Poulton that drug use by Garcia could be highly dangerous because of his mental instability. Harris discussed Garcia's situation with the director of the Parole Department, Larry Holm. They concluded that because Garcia was not regularly employed, he might be selling drugs to make a living. They were also concerned about Garcia living with the two juvenile females.

On November 28, Detective Voyles of the police department telephoned Larry Holm. Voyles told Holm that although the police did not have probable cause for a warrant to search Garcia's apartment, it would be "beneficial" to the police if the Parole Department would conduct a search. Holm replied that the Parole Department had already planned to conduct a search based on the possibility that drugs were being sold out of the apartment.

On November 29, Agents Holm, Poulton and Harris, accompanied by three other agents, Coombs, Kelly and Tonsi, went to Velasquez's apartment. After entering, Agents Poulton and Kelly went into Garcia's bedroom. Poulton noticed a hand axe by the bed (which may have been used in roofing work), immediately handcuffed Garcia, and told Garcia that he, Poulton, was going to look through Garcia's belongings, and asked if that were alright. After Garcia replied in the affirmative, Poulton searched Garcia's belongings and found nothing of any legal consequence.

At the same time that Agents Poulton and Kelly were confronting Garcia, Agents Harris and Coombs directed their attention to Velasquez. They first went to the living room where Velasquez had been watching television. At the request of Harris, the trio then went to Velasquez's bedroom where Coombs looked into an open closet and noticed on the closet shelf a box containing .22 shells. When Harris asked Velasquez if the officers could look around, Velasquez did not respond. The officers then handcuffed Velasquez and started to search. After some twenty minutes had passed, Agent Kelly searched a closet in the living room where he found a pistol and an ammunition clip. The next day November 29 Holm gave these items to the police.

The striation markings on a spent casing which had been found in the decedent's apartment were subsequently compared to markings on the casings of shells test fired from the pistol found in the defendant's apartment. The striations were similar. Fingerprints on the walls of the decedent's apartment matched the defendant's fingerprints.

The police brought charges for the murder of Richard Whitehead against Velasquez and against Brenda Valentine, who lived with Velasquez and Garcia. The charges against Valentine were ultimately dismissed. In a statement given to the police on December 6, 1979, Valentine disclaimed any involvement in the crime. She stated that on November 17 or 18, the defendant had stated that he wanted to fight someone and left the apartment. He returned a short time later, took something from the apartment, and left again. When he returned a second time, he was covered with blood and told Valentine that he had just "dusted" someone.

Prior to trial defendant moved to suppress the items seized in his apartment by the parole officers on the ground that they had been obtained in the course of a warrantless search. The trial court denied the motion on the basis of the rule enunciated in *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir.1975), that a warrantless search by a parole officer of a parolee's apartment is not in violation of the Fourth Amendment to the United States Constitution "when the [parole] officer reasonably believes that such search is necessary in the performance of his duties." *Id.* at 250.

At trial, Valentine changed her story, claiming that she had lied to the police in her story of December 6. She testified that she had been assaulted by Whitehead and that when the defendant intervened, a fight ensued. Whitehead, according to her trial testimony, was knocked unconscious and was subsequently accidentally shot by Valentine—not the defendant. The State, over objection, adduced evidence of Valentine's

December 6 statements concerning the homicide.

## I. FOURTH AMENDMENT RIGHTS OF PAROLEES

Defendant contends that the trial court erred in not suppressing the gun, clip, and .22 shells seized in his apartment by the parole officers. In essence he argues that the constitutional protections afforded individuals under the constitutional prohibitions against unreasonable searches and seizures apply to all individuals and that parolees are not excluded from those protections. Under both the Utah and federal constitutions, U.S. Const. amend. IV; Utah Const. art. I, § 14, warrantless searches and seizures are unreasonable and therefore prohibited subject only to a few specifically established exceptions. *E.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *State v. Lee,* Utah, 633 P.2d 48 (1981).

■ This Court has in the past relied on the theory that parolees have no greater Fourth Amendment rights than they had in prison because they are in *custodia legis* or "constructive custody," i.e., they have no Fourth Amendment rights. *Reeves v. Turner,* 28 Utah 2d 310, 501 P.2d 1212 (1972).[1] That theory has been discredited by the United States Supreme Court and a number of other courts. *E.g., Morrissey v. Brewer,* 408 U.S. 471, 481–82, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484 (1972); *State v. Pinson,* 104 Idaho 227, 657 P.2d 1095, 1098–99 (App.1983); *Roman v. State,* Alaska, 570 P.2d 1235 (1977); and 3 W. LaFave, *Search and Seizure,* § 10.10 at 423–26 (1978).

Clearly, parolees do have constitutional rights greater than do prisoners. *E.g., Morrissey v. Brewer, supra.*

■ Nevertheless, a number of courts, perhaps a majority, have held that a parolee's rights against searches and seizures by parole officers are not governed by the same standards that govern the privacy rights of individuals not subject to the supervisory control of the state.[2] Although some courts have ruled to the contrary, it has generally been held that parolees have "a diminished expectation of privacy." *Roman v. State, supra,* 570 P.2d at 1242. *Accord State v. Kent,* Utah, 665 P.2d 1317 (1983); *United States v. Scott,* 678 F.2d 32, 35 (5th Cir.1982); *Latta v. Fitzharris,* 521 F.2d 246, 250 (9th Cir.1975); *United States ex rel. Santos v. New York State Board of Parole,* 441 F.2d 1216, 1218 (2nd Cir.1971); *State v. Earnest,* Minn., 293 N.W.2d 365, 368–69 (1980); *State v. Montgomery,* 115 Ariz. 583, 566 P.2d 1329 (1977). *Contra State v. Cullison,* Iowa, 173 N.W.2d 533, 538 (1970). That is not to say, however, that parolees have no rights against warrantless searches and seizures. *People v. Huntley,* 43 N.Y.2d 175, 401 N.Y.S.2d 31, 34, 371 N.E.2d 794, 796 (1977). *See United States v. Consuelo-Gonzales,* 521 F.2d 259, 265 (9th Cir.1975). However, those rights are affected and modified by the necessary power that the state must have over parolees to administer successfully the parole system as a controlled passageway between prison and freedom. *Roman v. State, supra,* 570 P.2d at 1240.

■ The purpose of parole is to assist those who have broken the criminal law to make a controlled and supervised transition

---

1. This theory is that, although not actually incarcerated, a parolee is entitled to no greater constitutional rights generally than he would receive if he were in prison. *See, e.g., People v. Hernandez,* 229 Cal.App.2d 143, 40 Cal.Rptr. 100 (1964). Under this theory it follows that parolees have "no greater expectation of privacy outside prison than they had within," *State v. Pinson,* 104 Idaho 227, 657 P.2d 1095, 1098 (App.1983), and thus would be "liable to searches at any time for well-nigh any reason." *United States v. Scott,* 678 F.2d 32, 34 (5th Cir.1982).

2. In determining whether the constitutional protection against unreasonable searches and seizures has been violated, some courts have held that the rights of parolees and probationers are legally indistinguishable. *Roman v. State,* Alaska, 570 P.2d 1235, 1237 n. 3 (1977); *Seim v. State,* 95 Nev. 89, 94, 590 P.2d 1152, 1154 (1979). *See also Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 1759, 36 L.Ed.2d 279 (1973).

from prison life—with its intimate and constant association with a society of lawbreakers and a high degree of regimentation—to a complete reintegration into society without that kind of association and regimentation. To facilitate that transition, an inmate is permitted parole status subject to conditions designed to maximize the potential for a successful reintegration of the parolee by attempting to ward off some of the undesirable influences that may defeat the purpose of the parole system.

Thus, parole officers exercise close supervisory powers over a parolee that could not be exercised over ordinary citizens. In *Morrissey v. Brewer,* 408 U.S. 471, 477–78, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972), the Court stated:

> The essence of parole is release from prison, before completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.
>
> ... [These rules] restrict [the] activities [of parolees] substantially beyond the ordinary restrictions imposed by law on an individual citizen. Typically, parolees are forbidden to use liquor or to have associations or correspondence with certain categories of undesirable persons [e.g., other parolees].

*See also Latta v. Fitzharris,* 521 F.2d 246, 249 (9th Cir.1975). Parolees are also required to report regularly to their parole officers. *Morrissey v. Brewer, supra,* 408 U.S. at 478, 92 S.Ct. at 2598. To evaluate the parolee's progress, and to assist the parolee from avoiding further criminal conduct, the parole officer needs to "have a thorough understanding of the parolee and his environment, including his personal habits, his relationships with other persons, and what he is doing both at home and outside it." *Latta v. Fitzharris, supra,* at 249. Indeed, a parole officer may need to be aware of private information about the parolee, such as plans to change employment, travel outside the community, or incur substantial indebtedness. *Morrissey v. Brewer, supra,* 408 U.S. at 478, 92 S.Ct. at 2598; Arluke, *A Summary of Parole Rules—Thir-*

*teen Years Later,* 15 Crime & Delin. 267, 272–73 (1969). It may also be critical to the success of the program for a parole officer to have access to some information that a parolee may be unwilling to divulge, such as information pertaining to drug use or possession of firearms. *See Latta v. Fitzharris, supra,* 249–51. If the parole system is to be successful in achieving its objective of enabling a convict to leave a highly controlled prison environment and move to a point of less restraint and greater freedom in preparation for reentry into society, a parole officer needs to be able to act in a manner that could not be tolerated if done by a policeman or other agent of the state with respect to an ordinary citizen.

In formulating a rule to govern parole officer searches, consideration must be accorded both to "the government function involved" and to "the private interest that has been affected by governmental action." *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. at 2600, *quoting Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). *Accord State v. Simms,* 10 Wash.App. 75, 83, 516 P.2d 1088, 1093 (1974). The governmental interests have been discussed above. The individual's interest coincides to a large degree with the governmental interest, but in addition it includes the right of privacy protected by the Fourth Amendment. In balancing the interests of both the state and the individual, it is not unreasonable for a conditionally released convict to be accorded a more narrowly protected privacy interest to facilitate his moving more quickly from the confinement of prison to a point where his full panoply of civil liberties is restored. Unusual or special conditions in other contexts have also justified a more narrow application of the rights protected by the Fourth Amendment. *See United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). *See also Wyman v. James,* 400 U.S.

309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). *But see State v. Wasatch Metal & Salvage Co.,* Utah, 594 P.2d 894 (1979).

 In dealing with searches of parolees, we agree with those courts that have adopted what has been called a "middle ground" approach. In determining what constitutes permissible searches and seizures by parole officers, this approach, on the one hand, eschews the position that no constitutional protection should be afforded a parolee, but, on the other hand, does not require a warrant based on probable cause. Annot., *Validity, Under Fourth Amendment, of Warrantless Search of Parolee or His Property by Parole Officer,* 32 A.L.R. Fed. 155 (1977). Thus, although a warrant based on probable cause is not generally required, a parole officer must have reasonable grounds for investigating whether a parolee has violated the terms of his parole or committed a crime.[3] *E.g., United States v. Scott,* 678 F.2d 32 (5th Cir.1982); *United States ex rel. Santos v. New York State Board of Parole,* 441 F.2d 1216 (2nd Cir. 1971); *State v. Pinson,* 104 Idaho 227, 657 P.2d 1095 (App.1983); *State v. Earnest,* Minn., 293 N.W.2d 365 (1980); *Seim v. State,* 95 Nev. 89, 590 P.2d 1152 (1979); *Roman v. State,* Alaska, 570 P.2d 1235 (1977); *People v. Anderson,* 189 Colo. 34,

536 P.2d 302 (1975); *State v. Simms,* 10 Wash.App. 75, 516 P.2d 1088 (1974). Since the rationale of the rule we adopt is that a "reasonable search" rule is a condition of parole necessary to the operation of the parole system, it follows that the rule applies regardless of the language of the parolee agreement.[4]

The term "reasonable grounds" does not mean that which would be necessary for probable cause.[5] Rather, it means a reasonable suspicion that a parolee has committed a parole violation or crime. *See United States v. Scott, supra; United States ex rel. Santos v. New York Board of Parole, supra.* The search, however, must also be reasonably related to the parole officer's duty. *People v. Huntley,* 43 N.Y.2d 175, 401 N.Y. S.2d 31, 371 N.E.2d 794 (1977); *State v. Simms, supra,* 10 Wash.App. at 88, 516 P.2d at 1096.

Defendant urges that we should adopt a minority rule that a parolee search requires a warrant based on probable cause. *See United States v. Rea,* 678 F.2d 382 (2nd Cir.1982); *United States v. Bradley,* 571 F.2d 787 (4th Cir.1978); *State v. Fogarty,* Mont., 610 P.2d 140 (1980); *State v. Gansz,* Fla.App., 297 So.2d 614 (1974); *State v. Cullison,* Iowa, 173 N.W.2d 533 (1970). We decline to do so because that rule is not, in

**3.** We do not address the problem of whether a warrant must be obtained when a parolee is living with others who are not parolees. Caution would certainly suggest that a warrant be obtained if the rights of non-parolees might be affected. We also note that no forcible entry was made in the instant case. *Cf. Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

**4.** The standardized "Parole Agreement" ordinarily signed by parolees contains a provision which states:

I will submit to a search of my person, auto, place of residence [or] any other property under my control at any time of the day or night, without a warrant, upon reasonable cause, as ascertained by an agent of Adult Probation and Parole, to insure compliance with the conditions of parole.

Signing of such a provision cannot in itself constitute a waiver of constitutional rights. *. See People v. Huntley,* 43 N.Y.2d 175, 401 N.Y. S.2d 31, 371 N.E.2d 794 (1977). Such a signing "merely parallels, by way of confirmation, the

right of the parole officer ... to conduct searches rationally and substantially related to the performance of his duty." *Id.* at 182–83, 401 N.Y.S.2d at 35, 371 N.E.2d at 798.

**5.** As the United States Court of Appeals for the Fifth Circuit recently explained, the reasonable suspicion standard has been employed in a variety of contexts in the criminal law:

Less stringent a standard than probable cause, reasonable suspicion requires no more than that the authority acting be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant a belief in the conclusion mooted—in this instance, that a condition of parole has been or is being violated. *United States v. Scott,* 678 F.2d 32, 35 (5th Cir.1982). For the legal development of the reasonable suspicion standard, see *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); and *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

our view, consonant with the nature of a parole release or with the nature of the relationship that needs to exist between parole officers and parolees for the parole system to work. For a discussion of the drawbacks of such a rule, see *Latta v. Fitzharris,* 521 F.2d 246, 250–52 (9th Cir.1975).

The trial court, ostensibly applying the rule stated in *Latta v. Fitzharris, supra,* but in substance applying the rule we here adopt,[6] concluded that the search was conducted incident to a "reasonable suspicion" that Garcia and defendant had violated their paroles by dealing in or using drugs. The facts which made that suspicion reasonable were that Garcia and the defendant, both parolees, were living together with no visible means of support, and the information that the parole officers had from a police informant and from personnel at the Salt Lake County Mental Health Center that Garcia was dealing in drugs.

The defendant further argues that even under the reasonable suspicion rule, the search was unreasonable because (A) it was unrelated to the offenses resulting in the defendant's and Garcia's convictions and subsequent paroles; (B) the information which led the parole officers to suspect that either the defendant or Garcia had violated his parole was too unreliable to support a reasonable suspicion; (C) even if the parole officers had a reasonable suspicion to search Garcia, they did not have one to search defendant; and (D) the cooperation between law enforcement officials and parole officers in this case made the search a "subterfuge for criminal investigations," *United States v. Consuelo-Gonzales,* 521 F.2d 259, 267 (1975), *quoting Latta v. Fitzharris,* 521 F.2d 246, 249 (9th Cir.1975).

### A.

■■ There is no support in either law or logic for the defendant's proposition that parole officers can only search for items related to the offense underlying the parolee's conviction. The defendant contends that if a parolee is on parole following a conviction of manslaughter, for example, he may not be subjected to a warrantless search for drugs. However, there is no particular connection between the underlying conviction and the objectives of parole. Furthermore, such a rule would entangle the courts, parole officers, and parolees in a net of legal niceties and complexities. It would require probable cause in some situations and only reasonable suspicion in others, with no clear-cut distinction as to which rule should apply in any given case. Rules defining permissible conduct of state agents *vis-a-vis* individuals, including parolees, should not be so vague or complex that those who must live by them will be incessantly involved in litigation. It follows, therefore, that a parolee can be searched for evidence or contraband which is unrelated to his original offense. *See, e.g., State v. Pinson,* 104 Idaho 227, 657 P.2d 1095 (App. 1983) (parolee convicted of attempted forgery was validly searched for drugs); *State v. Earnest,* Minn., 293 N.W.2d 365 (1980) (parolee convicted of theft was validly searched for drugs); *United States v. Rea,* 524 F.Supp. 427 (E.D.N.Y.1981) (probationer convicted of illegally dealing in firearms was validly searched for drugs and forged baptismal certificates). In the instant case, the parole officers did not, therefore, err in searching for drugs without a warrant.

### B.

■ The defendant argues that the information of his alleged drug dealing was too unreliable for the officers to form a reasonable suspicion. For searches conducted by

---

**6.** The trial court stated that it applied the rule laid down in *Latta v. Fitzharris,* 521 F.2d 246 (9th Cir.1975), which allows searches when the parole officer reasonably believes (or even has a "hunch") that the search is necessary in the performance of his duties. *Id.* at 250. The standard actually applied by the court, however, was higher than the *Latta* standard. The court stated that the nature of parole supervision is such "that there is a necessity for unannounced searches based upon a reasonable suspicion of criminal activity or parole violation, which I have found as a matter of fact exist here." That is the "reasonable search" rule we here adopt.

parole officers pursuant to the reasonable suspicion standard, "[a] search cannot be based upon a mere hunch without factual basis, nor upon 'casual rumor, general reputation, or mere whim.'" *State v. Pinson,* 104 Idaho 227, 657 P.2d 1095, 1101 (App. 1983), *quoting State v. Simms,* 10 Wash. App. 75, 88, 516 P.2d 1088, 1096 (1973). *See contra Latta v. Fitzharris,* 521 F.2d 246, 250 (9th Cir.1975) (mere hunch is sufficient). However, under the reasonable suspicion standard, searches have generally been upheld where the parole officer's suspicion is based only on a tip by an anonymous informer, the police, or other sources. *E.g., Quigg v. France,* 502 F.Supp. 516 (D.Mont. 1980), aff'd 673 F.2d 1339 (1982) and *Seim v. State,* 95 Nev. 89, 590 P.2d 1152 (1979) (tip by anonymous informer); *United States ex rel. Santos v. New York State Board of Parole,* 441 F.2d 1216 (2nd Cir. 1971) (tip by N.Y.C. detective); *State v. Earnest,* Minn., 293 N.W.2d 365 (1980) (tip from another probation officer and law enforcement authorities); *State v. Coahran,* 27 Wash.App. 664, 620 P.2d 116 (1980) (tip by citizen informant); *United States v. Scott,* 678 F.2d 32 (5th Cir.1982) (tip by postal inspectors). *Contra People v. Jackson,* 46 N.Y.2d 171, 412 N.Y.S.2d 884, 385 N.E.2d 621 (1978); and *State v. Simms,* 10 Wash.App. 75, 516 P.2d 1088 (1973) (anonymous tip not sufficient for reasonable suspicion).

■ The parole officers' belief that Garcia may have been dealing in drugs was based on a tip from an informer relayed by the police that Garcia was dealing in drugs, information from a person at the Salt Lake County Mental Health Center, and the observation that the parolees had no visible means of support. We think those grounds were sufficient to support a reasonable suspicion that the parolees were illegally in possession of drugs.

### C.

■ The defendant contends that even if the parole officers had a reasonable suspicion to search Garcia, they did not have one to search him, since the tip implicated only Garcia in drug dealing.

It does not follow, however, that the pistol, ammunition clip, and .22 shells should have been suppressed. Both Garcia and Velasquez were parolees.[7] The search was valid initially, at least as to Garcia. However, both Garcia and Velasquez occupied and apparently had access to the entire premises. When the ammunition was found it was not clear whether it belonged to Garcia or to Velasquez, but in either case, the finding of the ammunition raised a reasonable suspicion that both were in violation of parole rules by being in possession of a firearm. Accordingly, the further search leading to discovery of the pistol was valid.

### D.

The defendant also asserts that "the parole officers were acting as agents for the police in order to find incriminating evidence regarding the homicide." The argument is that because Detective Voyles called Dennis Holm before the search and told Holm it would be "beneficial" to the police if Adult Probation and Parole would conduct a search, the probation officers were simply acting as a tool of the police.

■ Although parolees have diminished Fourth Amendment rights as to searches by parole officers, that does not mean that police officers may engage in warrantless searches and seizures as to parolees on the same basis as parole officers. *United States v. Scott,* 678 F.2d 32, 34 (5th Cir. 1982) (dictum); *United States v. Hallman,* 365 F.2d 289, 291 (3rd Cir.1966); *People v. Anderson,* 189 Colo. 34, 536 P.2d 302 (1975). A parole officer's search of a parolee, however, is not unlawful just because it is also beneficial to the police, or because evidence incriminating the parolee is turned over to the police and used in a criminal prosecu-

---

7. Although Velasquez had come from another state and had not signed a parole agreement, the record is clear that the Adult Probation and Parole had exercised jurisdiction over him pursuant to the interstate compact referred to above.

tion. *United States ex rel. Santos v. New York State Board of Parole,* 441 F.2d 1216 (2nd Cir.1971); *Seim v. State,* 95 Nev. 89, 590 P.2d 1152 (1979). As the court stated in *Santos, supra:*

> The mere fact that [a] police officer was the first to suspect that [the parolee] was engaged in criminal activity and related this to the parole officer . . . in no way alters the legality of the parole officer's presence [i.e., search]. It does not require the suppression of the seized evidence from use in a subsequent criminal prosecution.

*Id.* at 1218.

■ In the instant case the parole officers had decided that a search should be undertaken even before Detective Voyles talked to Dennis Holm. The parole officers already had a reasonable basis to suspect Garcia of a parole violation before Voyles told Holm that an informant had stated that Garcia had offered to sell drugs to the informant. The tip merely added substance to the reasonableness of the parole officers' actions. We find nothing in these events that evidences a circumvention of the requirement that the police act pursuant to a warrant.

■ As a final word on the point, we emphasize the limited nature of the "reasonable suspicion" rule. Searches conducted on that basis by a parole officer can be justified only " 'to the extent actually necessitated by the legitimate demands of the operation of the parole process.' " *State v. Simms,* 10 Wash.App. 75, 86, 516 P.2d 1088, 1095 (1974), *quoting In re Martinez,* 1 Cal.3d 641, 83 Cal.Rptr. 382, 386, 463 P.2d 734, 738 n. 6 (1970). *See also Roman v. State,* Alaska, 570 P.2d 1235 (1977). Parole officers must have a reasonable basis in fact; they cannot use "Gestapo" tactics to harass or intimidate parolees. *State v. Pinson,* 104 Idaho 227, 657 P.2d 1095, 1101 (App.1983); *Latta v. Fitzharris, supra,* at 252. "To do so would practically gut the principle that parolees are entitled to some privacy." *Latta v. Fitzharris, supra,* at 252. In short, our ruling should not be interpreted as a denigration of the importance of the Fourth Amendment's protection against unreasonable searches and seizures, but an accommodation of that right to the interests that both the individual and the state have in a parole system that can operate to fulfill its objectives.

## II. ALLEGED TRIAL ERRORS

The defendant also argues that the cumulative impact of five errors which occurred in the trial of the case prevented the defendant from presenting an effective defense and obtaining a fair trial.

First, the defendant points out that two jurors violated the court's admonition to avoid reading or listening to media reports of the trial by reading press reports during a weekend recess. On that basis the defendant moved for a mistrial. After questioning the two jurors, the trial court denied the motion.

■ It is axiomatic that a defendant is entitled to a fair and impartial trial based on the evidence presented to the jury, without the jury being influenced by information from outside sources. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *State v. Pierre,* Utah, 572 P.2d 1338 (1977). *See State v. Wood,* Utah, 648 P.2d 71 (1982). Publicity viewed by jurors during trial can deprive a criminal defendant of a fair trial. *KUTV, Inc. v. Conder,* Utah, 668 P.2d 513 (1983). Once a trial has started and jurors have received extra-record information that bears upon the trial, a protestation of non-prejudicial effect by the juror may not be enough to protect the integrity of the judicial process. In *People v. Lessard,* 58 Cal.2d 447, 25 Cal.Rptr. 78, 81, 375 P.2d 46, 49 (1962), the court stated:

> There can be no doubt that the reading by jurors of newspaper accounts of a trial in which they are engaged amounts to a violation of their duty and obligation
> . . . .

■ In the instant case, both jurors who disobeyed the court's order stated to the court that their exposure to the newspaper

articles would not influence their ability to render an impartial verdict and that the articles did not present any information that they had not already learned from the presentation of evidence. Under the circumstances, we are not persuaded that the improper conduct of the jurors was likely to have influenced the jurors in the performance of their duties.

 Second, the defendant asserts error because two police officers who testified violated the trial court's order prohibiting witnesses from discussing their testimony with any other witness. Near the end of trial, the defense discovered on cross-examination of Officer Gillies that he had violated the court's order by discussing Officer Voyle's testimony with Voyle just before Gillies took the stand. Voyle told Gillies that he (Voyle) had testified that it was a twenty minute drive from Valentine's place of arrest to the police station and that Valentine had been drinking when arrested. The defendant subsequently moved for a mistrial. The trial court was unable to discover any manner in which Gillies' testimony was influenced by the conversation. In fact, the trial court found that Gillies' recollection "of what Detective Voyles told him about the testimony in the courtroom was not what Detective Voyles had in fact testified to, at least with respect to the intoxication. And to that extent it seems that the testimony . . . elicited was helpful to the defendant rather than prejudicial." We agree with the trial court's conclusion that the officer's conduct constituted a violation of the court order, and we also agree that no prejudice resulted from the conversation. Nevertheless, we think it appropriate to point out that trial courts have full power to punish violations of such orders as contempt even when the violation is not prejudicial.

 Third, the defendant contends the court improperly restricted cross-examination of the State's expert witness. On cross-examination defense counsel questioned the State's fingerprint expert as to

the basis of his conclusion that the defendant's fingerprints matched those on the walls of the deceased's bedroom. Specifically, he was asked whether he had measured the distances between the ridges in the fingerprints found on the deceased's bedroom wall and compared them with the distances between the ridges in the defendant's known fingerprints. He stated that he had not done so. When defendant attempted, through a long line of questioning, to discredit the expert's testimony by posing hypothetical questions about how great the differences in the ridge measurements of two separate prints would have to be to show that different fingers had made the prints in question, the trial court sustained the State's objection.

Notwithstanding the undeniable importance of allowing great latitude in cross-examination in a criminal case, the trial court did not err in sustaining the State's objection. Since there was no evidence at all as to what the actual measurements were between the ridges of the two prints, both of which the witness testified were defendant's, the line of questioning pursued by the defendant could not possibly have led to relevant evidence. The witness had already testified that he had not employed that particular procedure for identifying fingerprints, which is only one among many methods.

Fourth, the defendant contends the court erred in refusing to strike portions of testimony elicited from two police officers as to Brenda Valentine's pre-trial statements to the officers. Portions of the officers' testimony as to her hearsay statements were admissible, and portions were not admissible, as exceptions to the hearsay rule under Rule 63(1)(a) and (b), Utah R.Evid., which allows evidence of a witness' prior statements as substantive evidence of the truth of the matter asserted if the declarant has testified at the trial inconsistently or professes to have forgotten the earlier statements.[8] The admissible hearsay, either be-

---

8. Rule 63(1) Utah R.Evid. provides the following exception to the hearsay rule:

(1) Prior Statements of Witnesses. A prior statement of a witness, if the judge finds that

cause it was inconsistent with Valentine's trial testimony or because she professed a lack of recollection at trial, was Valentine's earlier statements that defendant had stated on the night in question that he wanted to fight someone; that he had returned to his apartment covered with blood, claiming he had "dusted" someone, which Brenda understood to mean "killed" someone; and that he had requested Brenda to get rid of the gun if he were arrested.

■ However, the officers' testimony that Brenda Valentine had stated during the investigation that the defendant had returned to the apartment with a Playboy magazine and money which belonged to the deceased, and placed a paper bag with a gun in it in the kitchen, was not inconsistent with Valentine's trial testimony. Indeed, she had neither been asked nor had she volunteered anything at all about these items. Hence, her prior statements were not inconsistent with her trial testimony and, therefore, were not admissible.

Although defense counsel failed to object to the officers' testimony as to Valentine's out of court statements, he later moved to strike the testimony. The court denied the defendant's motion to strike on the ground that while part of the testimony was inadmissible, part was not, and it was not feasible in the trial court's view to separate the admissible from the inadmissible testimony under Rule 63(1) for the purpose of instructing the jury.

■ Under the circumstances of this case, the defendant's failure to object to the admissibility of the challenged evidence precludes him from raising the point on appeal. Utah R.Evid. 4. The motion to strike was not an adequate substitute for an objection in this case because of the close intermingling of the admissible with the inadmissible evidence. In any event, we

are satisfied that the jury would not have reached a different result if the motion to strike had been granted.

Fifth and last, the defendant contends the court erred in allowing the State to introduce photographs into evidence contrary to a stipulation entered into by the prosecutor and defense counsel. At the commencement of trial, the prosecutor and defense counsel stipulated that several photographs of the deceased would be admitted and others excluded. The court subsequently allowed the State to introduce some of the excluded photographs because the trial had taken a number of unexpected "twists and turns." The court noted that Valentine's testimony raised some questions about the position of the deceased's body and the circumstances of the killing not previously anticipated. Even defendant acknowledges that some of Valentine's evidence was unexpected at trial.

■ Parties are bound by their trial stipulations unless upon motion they are relieved therefrom by the court, which may, in the interest of justice and fair play, set aside a stipulation for inadvertence or justifiable cause. *First of Denver Mortgage Investors v. C.N. Zundel and Associates,* Utah, 600 P.2d 521 (1979); *Klein v. Klein,* Utah, 544 P.2d 472 (1975). A mistake of fact may also constitute a valid ground for setting aside a stipulation if the mistake is not due to failure to exercise due diligence and it could not have been avoided by the exercise of ordinary care. *Marrujo v. Chavez,* 77 N.M. 595, 426 P.2d 199 (1967); *Cartwright v. Atlas Chemical Industries Inc.,* Okl.App., 593 P.2d 104 (1979). *See also United Factors v. T.C. Associates Inc.,* 21 Utah 2d 351, 445 P.2d 766 (1968). On the present facts, it was well within the trial court's discretion and in the furtherance of justice to set aside the stipulation and per-

the witness had an adequate opportunity to perceive the event or condition which his statement narrates, describes or explains, provided that (a) it is inconsistent with his present testimony, or (b) it contains otherwise admissible facts which the witness de-

nies having stated or has forgotten since making the statement, or (c) it will support testimony made by the witness in the present case when such testimony has been challenged;

mit the photographs to be submitted as rebuttal evidence. *Call v. Marler,* 89 Idaho 120, 403 P.2d 588 (1965).

In sum, defendant's contention of reversible error because of the five asserted trial errors is without merit whether those contentions of error are viewed individually or in the aggregate.

Affirmed.

HALL, C.J., OAKS and HOWE, JJ., and OMER J. CALL, District Judge, concur.

DURHAM, J., does not participate herein; CALL, District Judge, sat.