STATE of Utah, Plaintiff and Appellee,

v.

Bradley C. DAVIS and Holly H. Hyatt, Defendants and Appellants.

No. 961271–CA.

Court of Appeals of Utah.

Aug. 6, 1998.

---

class B misdemeanor, in violation of Utah Code Ann. §§ 76–6–408 (1995) and 76–6–412 (Supp.1997). Defendant Holly H. Hyatt appeals her convictions for possession of methamphetamine, a third degree felony, in violation of Utah Code Ann. § 58–37–8 (1998), and possession of drug paraphernalia, a class B misdemeanor, in violation of Utah Code Ann. § 58–37a–5 (1998). We affirm in part and reverse in part.

## FACTS

The events which led to the convictions from which defendants appeal began on November 15, 1994. Defendant Davis was then on probation under the terms of an agreement which included the usual proscriptions against possessing firearms, possessing or using controlled substances, knowingly associating with persons involved in criminal activity, and engaging in criminal activity. On November 15, Utah Adult Probation and Parole Officers Robert Eckman and Rod Seymour visited Davis at his Cedar City home, where Davis lived with defendant Hyatt. The officers conducted a search which led to the discovery of drug paraphernalia and a firearm. The incriminating items were found in Davis's bedroom and in a tan van he had been driving. Also, Davis admitted to the officers that he had used both marijuana and methamphetamine during the prior week. The officers arrested Davis and placed him on a seventy-two-hour hold, after which he was released.

Five days later, on November 20, 1994, Division of Wildlife Resources Officer Gary A. McKell was called to assist a Hurricane City Police Officer, who had stopped a vehicle occupied by Mark Milby and Kelly Blackburn. The two were found with drugs and paraphernalia. Milby was arrested and Blackburn was cited and released. Officer McKell was called because the Hurricane officer found deer blood and hair in the back of Milby's vehicle and on a knife and gloves. Officer McKell, thinking that a poached deer and drug activity might just be found at the

D. Bruce Oliver, Salt Lake City, for Defendants and Appellants.

Jan Graham, Atty. Gen., and Thomas B. Brunker, Asst. Atty. Gen., Criminal Appeals Div., Salt Lake City, for Plaintiff and Appellee.

Before BENCH, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Defendant Bradley "Chick" Davis appeals his convictions for possession of cocaine and methamphetamine with intent to distribute, both second degree felonies, in violation of Utah Code Ann. § 58–37–8 (1998);[1] possession of marijuana with intent to distribute, a third degree felony, in violation of Utah Code Ann. § 58–37–8 (1998); possession of drug paraphernalia, a class B misdemeanor, in violation of Utah Code Ann. § 58–37a–5 (1998); and possession of stolen property, a

1. As a convenience to the reader, and because the provisions in effect at the relevant times do not differ materially from the statutory provisions currently in effect, we cite to the most recent statutory codifications throughout this opinion, unless otherwise noted.

Milby residence in Summit, Utah, contacted Sergeant Rick Evans of the Iron County Sheriff's Department and asked him to watch the residence.

At approximately 2:00 a.m. the following morning, close to the end of his shift, Sergeant Evans drove to Milby's house. Evans observed that all of the lights were on and that Blackburn's truck was idling in front. Evans decided to wait and watch. About ten minutes later, he saw someone in a tan van approach, veer as if to turn into Milby's driveway, but then change course upon seeing Evan's patrol car. Instead of pulling into the Milby driveway, the van driver drove off down the street. Suspicious, Sergeant Evans followed the van for a short distance to the Summit Truck Stop, where he parked behind the van but sufficiently to its side that the driver could have backed out without hitting Evans's patrol car.

Both Evans and the driver of the van exited their vehicles and Evans approached and asked the driver who he was and what he was doing. The driver of the van identified himself as Chick Davis and told Sergeant Evans that he sometimes drove around at night to take his mind off his son's recent death. During this encounter, Evans had not used his overhead lights, had not ordered Davis out of the van, did not ask to see Davis's driver's license or registration, and never came within touching distance of Davis.

After hearing Davis's explanation, Sergeant Evans left the Summit Truck Stop and was returning the way he came when he passed Blackburn, who was headed towards the truck stop. Evans turned and followed Blackburn to the truck stop, where he saw Blackburn park next to Davis's van, go into the diner, and sit down with Davis. Later that day, Sergeant Evans contacted probation officers Eckman and Seymour and told them what he had seen. Based upon this information, their discovery of Davis's probation violations several days earlier, and their personal familiarity with Milby and his involvement with drugs, Eckman and Seymour, suspicious that Davis was again violating his probation, decided to again search the Davis and Hyatt residence.

On November 21, 1994, Eckman and Seymour, joined by other officers, conducted a warrantless probation search of the house shared by Davis and Hyatt, a nearby shed, and several vehicles parked on the property—including the tan van which they had searched four days earlier and which Sergeant Evans saw Davis driving earlier that morning. In addition to the van, there was a blue Ford Escort, a black Chevrolet Camaro, a red pickup truck, a white Chevrolet Blazer, and a camper-trailer on the property. The officers did not check the registration on any of the vehicles or otherwise obtain registration information before searching them, nor did they ask Davis or Hyatt who owned or used the vehicles. In the van, the officers discovered paraphernalia and marijuana; in the Escort, the officers discovered a blue diaper bag which contained methamphetamine, marijuana, cocaine, and paraphernalia; and in the house, the officers discovered a set of double-beam scales under a bed. Additionally, in the shed behind the house, officers found a staple gun marked "Goer," the partial name of a local company, Goer Manufacturing, and a router, later alleged to be stolen from Middleton Timber, another local business.

The State subsequently charged Davis with possession of methamphetamine, cocaine, and marijuana with intent to distribute; possession of drug paraphernalia; and possession of stolen property. The State charged Hyatt with possession of methamphetamine and possession of drug paraphernalia. The defendants filed motions to suppress, arguing that the search was not supported by reasonable suspicion, and that, with respect to Hyatt, the search was not supported by a warrant or probable cause. A suppression hearing was held on September 5 and October 2, 1995, after which the trial court denied the motions. At the conclusion of trial, held on December 7 and 8, 1995, a jury convicted the defendants on all counts.

## ISSUES

Defendants raise four principal arguments on appeal. First, defendants contend that

the trial court erred in denying their motions to suppress the evidence seized during the November 21 probation search because the search was not supported by reasonable suspicion, as required under Davis's probation agreement and Utah law. Second, defendants claim that, because the search was not supported by a warrant nor any exception to the warrant requirement, the trial court erred by failing to suppress the evidence found in nonprobationer Hyatt's blue Escort. Third, Davis argues that there was insufficient evidence to convict him of possession of stolen property and therefore the trial court erred in failing to dismiss the charge. Fourth, Davis argues that the trial court improperly admitted two State witnesses' testimony regarding prior drug purchases from Davis and Hyatt.

### REASONABLE SUSPICION

Defendants argue that the November 21 search of their home and property was not supported by a reasonable articulable suspicion that Davis had violated his probation as required by Davis's probation agreement and Utah law. They therefore contend that the trial court erred in denying their motions to suppress the evidence seized during the allegedly illegal search.

■ We review a trial judge's decision regarding whether the facts of a particular case give rise to a reasonable suspicion nondeferentially, for correctness. *See State v. Pena,* 869 P.2d 932, 939 (Utah 1994). We must nonetheless afford trial judges "a measure of discretion" in applying the reasonable suspicion standard. *Id.*

■ "It is abundantly clear that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." ' " *State v. Martinez,* 811 P.2d 205, 209 (Utah Ct.App.) (quoting *Griffin v. Wis-*

*consin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (citation omitted; alteration in original)), *cert. denied,* 815 P.2d 241 (Utah 1991). This conditional liberty necessarily arises from the need to balance the individual interests of probationers against the needs of government and society. *See generally Griffin,* 483 U.S. at 873–75, 107 S.Ct. at 3168–69; *State v. Velasquez,* 672 P.2d 1254, 1258–59 (Utah 1983); 4 Wayne R. LaFave, *Search and Seizure* § 10.10(c), at 766–775 (3d ed.1996) (discussing "administrative search" or "balancing theory" for parolee and probationer searches). Searches directed at probationers are therefore an exception to the usual warrant and probable cause requirements under the state and federal constitutions. *See Griffin,* 483 U.S. at 873–74, 107 S.Ct. at 3168.

Though a warrant based on probable cause is not required for a probation search, "the Fourth Amendment to the United States Constitution requires that a probation officer have reasonable suspicion before commencing a warrantless search of a probationer's residence." *State v. Ham,* 910 P.2d 433, 438 (Utah Ct.App.1996).[2] This reasonable suspicion requirement is echoed by a provision of Davis's probation agreement, wherein Davis consented to searches of his "person, residence, vehicle or any other property under [his] control, without a warrant, at any time, day or night, upon reasonable suspicion to ensure compliance with the conditions of [his] Probation Agreement." Defendants contend that reasonable suspicion was lacking and that therefore the trial court abused its discretion in denying their motions to suppress all evidence seized during the search.

We apply a two-part test to warrantless probation searches: "[T]o constitute a valid warrantless search, there must be evidence (1) that the [probation] officer has a reasonable suspicion that the [probationer] has committed a [probation] violation or crime, and (2) that the search is reasonably related

2. This court has noted that the reasonable suspicion standard applies to searches of both probationers and parolees. *See State v. Martinez,* 811 P.2d 205, 209–10 (Utah Ct.App.), *cert. denied,* 815 P.2d 241 (Utah 1991). *See also United States v. Davis,* 932 F.2d 752, 758 (9th Cir.1991) ("We do not believe the distinction between the status of

parolee and that of a probationer is constitutionally significant for purposes of evaluating the scope of a search."). *See generally,* 4 LaFave, *supra,* § 10.10(c), at 767–69 (discussing searches of probationers and parolees and noting that same concerns generally apply to both groups).

to the [probation] officer's duty." *State v. Johnson*, 748 P.2d 1069, 1072 (Utah 1987).

In applying the first part of this test, we note that " 'reasonable suspicion requires no more than that the authority acting be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant a belief ... that a condition of [probation] has been or is being violated.' " *Velasquez*, 672 P.2d at 1260 n. 5 (quoting *United States v. Scott*, 678 F.2d 32, 35 (5th Cir.1982)). *Accord Johnson*, 748 P.2d at 1072. However, a probation search " 'cannot be based upon a mere hunch without factual basis, nor upon "casual rumor, general reputation, or mere whim." ' " *Velasquez*, 672 P.2d at 1262 (citations omitted). To determine whether the facts known to the officers legitimately gave rise to a reasonable suspicion, we do not address each fact in isolation, but instead view them in their totality. *See State v. Strickling*, 844 P.2d 979, 983 (Utah Ct.App.1992).

Davis's probation agreement included proscriptions against possessing firearms, possessing or using controlled substances, knowingly associating with criminals, and engaging in criminal activity. Violation of any one of these proscriptions constituted a probation violation. When they searched the Davis and Hyatt residence, the officers knew the following: Six days before the search, Davis violated the terms of his probation by possessing drug paraphernalia and a firearm and by using marijuana and methamphetamine. The evening before the search, Hurricane police arrested Milby for possessing methamphetamine and cited Blackburn for possessing drug paraphernalia. Milby's arrest and Blackburn's citation triggered an investigation of Milby for possible poaching and further drug activities. Officers considered Milby to be a known drug user and a possible dealer. A few short hours after Milby's arrest, at two o'clock in the morning, Sergeant Evans saw Blackburn's truck idling outside of Milby's house and saw Davis approach. Davis started to pull into Milby's driveway, but aborted when he saw Sergeant Evans's patrol car. A few minutes later, Evans saw Davis and Blackburn meet at the Summit Truck Stop.

Based on the totality of the facts known to the probation officers—and the legitimate inferences drawn from those facts—they appropriately harbored a reasonable suspicion that Davis had violated his probation. The first part of the reasonable suspicion test is therefore satisfied.[3]

The second part of the probation search test requires that the search be reasonably related to the probation officers' duties. This requirement "deters police officers from using [probation] agents to evade the necessity of procuring a warrant prior to a search." *United States v. Lewis*, 71 F.3d 358, 362 n. 3 (10th Cir.1995) (applying Utah warrantless search test to search of parolee's residence). *See also Johnson*, 748 P.2d at 1072 n. 2 ("A parole search is invalid if the parole officer acts merely as an agent or tool of the police."). Here, Eckman and Seymour's search of the Davis and Hyatt home was clearly related to the probation officers' duties.

In *Lewis*, the Tenth Circuit found that a search by parole agents of a parolee's home was reasonably related to the agents' duties and to the " 'legitimate demands of the operation of the parol process' " because the agents were properly concerned that the pa-

---

**3.** Davis also argues that Sergeant Evans "stopped" him at the Summit Truck Stop and that the alleged stop was not premised upon a reasonable suspicion. We disagree. At the truck stop, Evans pulled in behind Davis but sufficiently to the side that Davis could back out; Evans did not activate his lights or siren; he did not order Davis out of the van; he did not ask to see Davis's license or registration; and he never approached within touching distance of Davis. Rather, Evans merely asked Davis who he was and what he was doing, and Davis raised no objection to Evans's actions. After Davis answered Evans's two questions, Evans promptly left. " '[A]n officer may approach a citizen at [any time] and pose questions so long as the citizen is not detained against his will.' " *State v. Deitman*, 739 P.2d 616, 617 (Utah 1987) (per curiam) (quoting *United States v. Merritt*, 736 F.2d 223, 230 (5th Cir.1984)). Because Evans only briefly questioned Davis and in no way detained him against his will, the events at the truck stop constituted a level one encounter which did not implicate Davis's Fourth Amendment rights. *Cf. id.* at 618.

rolee was involved in drug activity and violating the terms of his parole. 71 F.3d at 363 (quoting *Velasquez*, 672 P.2d at 1263). The court explained: "To adequately deter misconduct and protect the public, parole agents must be permitted to act expeditiously upon reasonable suspicion of a parole violation." *Id.* The same is true here: The warrantless search of the Davis and Hyatt home was reasonably related to the probation officers' duties to protect the public and prevent Davis from violating his probation. Thus, like the first, the second part of the probation-search test is satisfied, and we therefore conclude that the trial court did not err in denying the defendants' motions to suppress on this basis.

## SEARCH OF HYATT'S ESCORT

Defendants contend that the blue Escort, which was registered in Hyatt's name only, was not property over which Davis had common authority or control, and therefore the officers needed more than a reasonable suspicion to search it. In response, the State argues that, because she lived with probationer Davis, Hyatt shared his reduced expectation of privacy and that she impliedly consented to searches of areas over which Davis had common authority—including the blue Escort.

Before turning to the merits of these contentions, we pause briefly to address the dissent's suggestion that this issue is not properly before us on appeal. At the outset, we note that Davis's common authority over the Escort was central to the arguments below, both at the suppression hearing and at trial. At the end of the suppression hearing, the trial judge ruled from the bench that the central issue regarding the search of Hyatt's car was whether Davis had "access and control over" the car. The trial court concluded that Davis had such access and control. Moreover, in the trial court's Findings of Fact, Conclusions of Law, and Order on defendants' motions to suppress, the trial court found that Davis had "access to and control of the blue Ford Escort" and that much of the contraband found during the search was discovered "in common areas" of the home and in the two vehicles that "both [d]efen-

dants had access to, and control over." Further, the trial court concluded that Hyatt had a "reduced 'expectation of privacy'" in the residence and the vehicles located within common areas. In appealing the trial court's denial of their motions to suppress, the defendants challenge these very findings and conclusions. Moreover, at trial, substantial testimony addressed whether the officers had reason to believe Davis had authority over or access to the Escort, as evidenced by the several officers who testified concerning footprints leading to the car.

The parties have not dropped these important questions on appeal. The defendants argue in their brief that because Hyatt was not on probation, a search of her property had to be supported by probable cause and/or a warrant. In response, the State argues that because Hyatt lived with a probationer, she had a reduced expectation of privacy and that she impliedly consented to searches of areas within Davis's common authority based only on a reasonable suspicion. The State further contends that Hyatt failed to show she had a fully protected expectation of privacy in the Escort because she failed to show that it was within her exclusive control. Both parties spent substantial time at oral argument addressing the defendants' authority and control over the Escort. Given these arguments, which propose differing search standards, it is difficult to see how one could avoid addressing the issue of Davis's authority and control over the Escort. The issue is key to any consideration of the propriety of the Escort search, in which much of the incriminating evidence was found.

Thus, we respectfully disagree with the dissent's assertion that Davis's common authority or control over the Escort is not properly before us. Not only was the common authority issue a primary concern below, but it is inescapable on appeal. Accordingly, we appropriately turn our attention to these competing arguments.

As framed by the parties, the pivotal question is whether Davis had "common authority" over the blue Escort such that the officers needed only a reasonable suspicion to justify the warrantless search. "We of course defer to the trial court's findings of

the underlying facts, applying a clearly erroneous standard, so long as the findings have adequate evidentiary support. However, we will apply a correction of error standard to the trial court's ultimate legal conclusion," *State v. Elder*, 815 P.2d 1341, 1343 (Utah Ct.App.1991) (citations omitted), while according "a measure of discretion" to the trial court. *State v. Pena*, 869 P.2d 932, 939 (Utah 1994).

■ In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the United States Supreme Court explained that consent to search can be given not only by a defendant, but also by "a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171, 94 S.Ct. at 993. Common authority to consent to a search

> rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. *See Elder*, 815 P.2d at 1343. Thus, a showing of common authority requires "persuasive evidence of both shared use *and* joint access or control." *United States v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir.1992) (emphasis in original). *Accord United States v. Whitfield*, 939 F.2d 1071, 1074–75 (D.C.Cir. 1991). When a probationer lives with a nonprobationer, the common authority rule pronounced in *Matlock* defines the permissible scope of a probation search. *See State v. Johnson*, 748 P.2d 1069, 1074 (Utah 1987) ("[T]he *Matlock* doctrine applies with equal force in parole cases."). In *Johnson*, the Utah Supreme Court explained:

> When a parolee lives with a nonparolee, courts generally hold that the cotenancy restricts, to some degree, the extent of a permissible consent search. The scope of consent impliedly given by a cotenant is limited to those parts of the premises where the tenants possess "common au-

thority over or other sufficient relationship to the premises or effects sought to be inspected."

*Id.* at 1073 (quoting *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993). *Accord Milton v. State*, 879 P.2d 1031, 1035–36 (Alaska Ct.App.1994).

■ Thus, by accepting the terms of his probation, Davis consented to searches of any areas of the residence over which he had common authority with Hyatt, and the officers could premise their search of these areas on reasonable suspicion that Davis had violated a condition of his probation. This was a risk Hyatt assumed by living with Davis, a probationer. The risk Hyatt assumed, however, was not unlimited.

Because probation searches can be based on only a reasonable suspicion, probation searches where a probationer lives with a nonprobationer present considerable peril to the nonprobationer's Fourth Amendment rights. "Inasmuch as authority to search the residence of a parolee [or probationer] extends to areas which are jointly controlled with other occupants of the residence, the authority to search these premises necessarily portends a massive intrusion on the privacy interests of third persons solely because they reside with a parolee [or probationer]." *People v. Burgener*, 41 Cal.3d 505, 224 Cal. Rptr. 112, 714 P.2d 1251, 1269 (Cal.1986) (en banc) (citation omitted). *Cf. State v. Velasquez*, 672 P.2d 1254, 1260 n. 3 (Utah 1983) ("Caution would certainly suggest that a warrant be obtained if the rights of non-parolees might be affected [by a parole search].").

The United States Supreme Court has applied a reasonableness standard to police conduct in search and seizure cases—a standard which applies with equal force in probation search cases. "[T]o satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185–86, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990). Moreover,

[a]s with other factual determinations bearing upon search and seizure, determination of consent ... must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?

*Id.* at 188–89, 110 S.Ct. at 2801 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)).

■ The risk to nonprobationers' Fourth Amendment rights demands that, when officers conduct a probation search where a probationer lives with a nonprobationer, the facts available to the officers must support a reasonable belief that the probationer has at least common authority over the area searched. Under this standard, the officers searching the Davis and Hyatt residence were entitled to search, based upon a reasonable suspicion of a probation violation, those areas of the property they reasonably believed were under Davis's exclusive or common authority or control. However, contrary to the State's argument on appeal, Hyatt does not bear the burden of establishing her exclusive control over the Ford Escort. Rather, "[t]he State bears the burden of proving common authority, and it must do so by a preponderance of the evidence." *State v. Brown,* 853 P.2d 851, 855 (Utah 1992). *Accord Rodriguez,* 497 U.S. at 181, 110 S.Ct. at 2797. *See also People v. Elders,* 63 Ill.App.3d 554, 20 Ill.Dec. 333, 380 N.E.2d 10, 14 (Ill.App.Ct.1978) ("It is only where the record *affirmatively establishes* 'joint occupancy' or 'equal rights to possession' that one spouse's consent to a search is binding against the other.") (emphasis added). Moreover,

> [t]he [State's] burden cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to "mutual use" by the person giving consent, "then warrantless entry is unlawful *without further inquiry.*"

*United States v. Whitfield,* 939 F.2d 1071, 1075 (D.C.Cir.1991) (quoting *Rodriguez,* 497

U.S. at 188–89, 110 S.Ct. at 2801 (emphasis added)). Here, the State has failed to meet its burden.

■ The record shows that shortly after the search team arrived at the residence, Cedar City Police Officer Kenneth Stapley took Hyatt from the house to his vehicle where he questioned her. Stapley testified that he asked Hyatt if there were any controlled substances in the house, and that Hyatt's response was, "I don't believe so. Chick cleaned the house out a couple of days ago. There shouldn't be anything left." Stapley took this statement to mean that Davis, believing the residence would be searched, removed narcotics from the home to "possibly hide them in another location." Stapley also somehow took Hyatt's statement to mean that Davis had merely moved drugs from the home to other parts of the property rather than destroying them or moving them off the property altogether. Stapley therefore called additional officers to help search the cars and outbuildings on the property and instructed the officers to "make sure we don't miss any of the buildings or cars." That this was the instruction to the searching officers was corroborated by one officer who testified that "they wanted us to search all the vehicles in the outside area and the sheds and around the house."

Thus, despite his failure to ascertain the scope of Davis's authority in his discussion with Hyatt, Stapley told the officers to search everywhere, and he included no cautionary instruction that they should beware of areas that appeared outside of Davis's authority. Further, one officer was asked at trial: "And was anybody controlling the[ ] movement [of the approximately eight to ten officers at the scene], saying, 'Don't go here; don't go there. You can go here; you can go there,' or did they say, 'Search the place'?" The officer replied: "I don't recall any control of movement, no." Additionally, though he questioned Hyatt, Stapley did not ask if any of the several vehicles present belonged to her or to third parties, never asked for her consent to search the home or any of the surrounding vehicles, and otherwise made no attempt to determine if any areas were outside of Davis's common authority and conse-

quently beyond the scope of the probation search. In fact, not one of the testifying officers attempted to determine who owned or used the vehicles before searching them, even though several officers only knew Davis to drive the tan van.

It is clear from the foregoing that the officers conducted their search of the Davis and Hyatt property without any particular concern for areas over which Hyatt may have possessed a reasonable expectation of privacy.[4] The officers were faced with what can only be described as an "ambiguous" situation concerning whether Davis had common authority over the Escort. *See United States v. Salinas–Cano,* 959 F.2d 861, 864 (10th Cir.1992); *Whitfield,* 939 F.2d at 1075. *Cf. Reeves v. State,* 818 P.2d 495, 503 (Okla. Crim.App.1991) (concluding that defendant's ex-wife had apparent authority to consent to search of car as shown by officer's knowledge that she had keys, she gave keys to police, she told them defendant had just told her to hide car, and car was parked in front of her apartment).

The State argues that the search of the Escort was premised on the officers' reasonable belief that Davis was using it, as evidenced by allegedly male footprints in the snow found leading to the car. In fact, Officer Eckman testified that "footprints leading to the door of the car" prompted him to search the Escort. The State's argument is unpersuasive.

First, the record offers no support for the contention that the footprints were Davis's. At trial, witnesses testified that many people frequented the Davis residence; eight to ten officers were at the scene for about an hour before the Escort was searched; no one was controlling the officers' movements around the property; the footprints could have been male or female and could have been made by the officers, rather than Davis; and there

were multiple sets of prints leading to the Escort. Further, the fact that every vehicle on the property was searched pursuant to Officer Stapley's instruction reinforces the conclusion that the presence of footprints was not the determining factor which led the officers to search the Escort. Finally, even if it were Davis's footprints going to the Escort, this fact alone would not establish "common authority" over the vehicle.

We conclude that the State failed to show that the officers knew facts which reasonably supported a belief that Davis had common authority over the Escort. The officers did not have enough information to determine that the Escort was within Davis's common authority and therefore subject to search. *See Whitfield,* 939 F.2d at 1074 (holding that agents could not have reasonably believed third party had authority to consent to search because "[t]he agents simply did not have enough information to make that judgment"). *See also Salinas–Cano,* 959 F.2d at 866 (stating that information known to officer was insufficient to support reasonable belief that third party had mutual use of searched property and, therefore, authority to consent to search of property). Rather, the only conclusion supported by the record is that the authorities undertook a search of the entire premises, uncircumscribed by the consideration that a nonprobationer also lived there and likely had a reasonable expectation of privacy in parts of the property. " 'Neither reason nor authority support the proposition that police may conduct a general search of the private belongings of one who lives with a [probationer].' " *People v. Veronica,* 107 Cal.App.3d 906, 166 Cal.Rptr. 109, 110 (Cal.Ct.App.1980) (citation omitted).

As previously suggested, the officers could have easily taken steps to avoid intruding upon Hyatt's Fourth Amendment rights.

---

**4.** The unlimited extent of the search is shown by the search of Hyatt's handbag, found hanging from a bedroom door. The searching officer testified that when he searched it, he "thought it was Holly's" handbag. While, based on this testimony, the trial court suppressed the evidence found in the handbag, the officers' willingness to search property clearly belonging to Hyatt—as well as property which may otherwise be reasonably believed to be outside the scope of

Davis's common authority—demonstrates they simply did not have the proper legal criteria in mind in conducting this search involving the rights of a nonprobationer. Had they been mindful of the applicable standards, Hyatt would have been asked who owned the many cars and who had the keys to them. The officers could also have checked motor vehicle records for ownership information.

The officers could have run the license numbers on the vehicles to be searched and/or questioned defendants regarding the vehicles' ownership and use. "[W]here police officers do not know who owns or possesses a residence or item and such information can be easily ascertained, it is incumbent upon them to attempt to ascertain ownership in order to protect the privacy interest of both probationer and nonprobationer." *People v. Tidalgo*, 123 Cal.App.3d 301, 176 Cal.Rptr. 463, 466 (Cal.Ct.App.1981) (citations omitted).

The State has failed to meet its burden of establishing that the Ford Escort was within the scope of Davis's common authority.[5] We therefore conclude that the trial court erred in failing to suppress the evidence found in the Escort.

## POSSESSION OF STOLEN PROPERTY

During the November 21 search, officers seized a staple gun and a router from Davis's shed, believing they were stolen. Based on this evidence, Davis was charged with possession of stolen property. Davis argues there was insufficient evidence to convict him of possession of stolen property under Utah Code Ann. §§ 76-6-408 (1995) and 76-6-412 (Supp.1997) and, therefore, that the trial court erred when it refused to dismiss the charge and instead submitted the matter to the jury.

We will affirm a trial court's denial of a motion to dismiss based upon insufficient evidence "if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Dibello*, 780 P.2d 1221, 1225 (Utah 1989). *Accord State v. Hill*, 727 P.2d 221, 222 (Utah 1986); *State v. Gray*, 851 P.2d 1217, 1225 (Utah Ct.App.), *cert. denied*, 860 P.2d 943 (Utah 1993).

The elements of the crime of receiving stolen property are as follows:

> A person commits theft if he receives, retains, or disposes of the property of another knowing that it has been stolen, or believing that it probably has been stolen, or who conceals, sells, withholds or aids in concealing, selling, or withholding the property from the owner, knowing the property to be stolen, intending to deprive the owner of it.

Utah Code Ann. § 76-6-408(1) (1995). *See also Hill*, 727 P.2d at 223 (discussing elements of possession of stolen property). Thus, in addition to possession and intent, a necessary element of the crime—and the only one at issue here—is that the defendant knew the property was stolen or believed the property was probably stolen.

Davis argues that the State presented no evidence that he knew the staple gun and router were stolen, and therefore there was insufficient evidence for the jury to convict him, beyond a reasonable doubt, of receiving stolen property. In particular, Davis argues that the router was never reported stolen by

---

5. At the suppression hearing, Hyatt did testify under cross-examination that Davis had "access to" the Escort, a fact neither side called to our attention. Nonetheless, Hyatt's unexplained testimony does not show that Davis had "common authority" over the vehicle. While Hyatt did testify that Davis had "access to" the Escort, the testimony was offered in the context of crossexamination concerning how the bag of drugs got into the Escort. Hyatt also testified that the diaper bag was hers, but that she did not place it in the Escort and that *anybody* could have had access to the bag and to the Escort. Taken in context, Hyatt's statement does not therefore establish that Davis had the requisite common authority over the Escort. As the *Milton* court explained:

> The fact that the probationer may be physically capable of gaining access to areas or items ...

is not decisive when determining the scope of the authorized search.... If the law allowed a probation officer to search any area or item that the probationer might have gained access to, practically everything within the house would be subject to search. Such a result is contrary to the established law in this area, which requires that the probation officer have a reasonable suspicion that the area or item to be searched is within the "ownership, possession, or control of the probationer."

879 P.2d at 1036 (quoting *United States v. Davis*, 932 F.2d 752, 760 (9th Cir.1991)). Accordingly, in addition to access, common authority requires a showing of "mutual use" by persons "generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. *Accord Salinas–Cano*, 959 F.2d at 864.

its owner and that a substantial time intervened between the alleged theft of both tools and their later discovery in his shed.

■■■■ We conclude that, based upon the evidence presented, the jury could reasonably find that the staple-gun, marked "Goer," was probably stolen and that Davis would have believed it probably was stolen. " 'Knowledge or belief of the stolen character of goods is seldom directly proved and is usually inferred from the facts and circumstances in evidence.' " *State v. Sales,* 857 S.W.2d 480, 481 (Mo.Ct.App.1993) (citation omitted). *Accord State v. Neel,* 8 Or.App. 142, 493 P.2d 740, 743 (Or.Ct.App.1972). *Cf. State v. Murphy,* 617 P.2d 399, 402 (Utah 1980) (plurality opinion) ("[P]roof of a defendant's intent is rarely susceptible of direct proof and therefore the prosecution usually must rely on a combination of direct and circumstantial evidence to establish this element.").

The State presented the following evidence to the jury: The staple gun had the name "Goer" etched into it; Goer Manufacturing was a nearby company; a Goer employee identified the staple gun at trial as one belonging to the company; and the Goer employee testified that Goer did not sell or give away its tools and that, therefore, if Davis had the staple gun, it must have been stolen. Thus, there was ample evidence that Davis did not purchase or otherwise obtain the staple gun directly from Goer—at least not by any legal means. The State also offered testimony from Daniel Balduck, who stated that on several occasions prior to Davis's November 21 arrest, he traded stolen tools to Davis in exchange for drugs. Although Davis did not testify at trial, as was his right, he wholly failed to offer any plausible explanation—either through testimony of other witnesses or arguments of counsel—for why he had the staple gun.

"[A]s a practical matter, if the attendant circumstances suggest that a reasonably cautious or perceptive person would have known or believed that the property was stolen, the jury may choose to infer, absent a plausible explanation, that the defendant had the requisite knowledge or belief." 3 Charles E. Torcia, *Wharton's Criminal Law* § 441, at 600–01 (15th ed.1995). We conclude that the State presented sufficient evidence to the jury from which it could reasonably conclude that Davis probably believed the staple gun was stolen. We therefore affirm Davis's conviction with respect to the staple gun.

■■■■ The router, on the other hand, is on a different footing. The only substantial evidence presented at trial was the testimony of the owner of Middleton Timber, who testified that in December 1993 someone stole the router, which he identified by the replacement chord he installed on the tool shortly after he bought it. Unlike the staple gun, the router had no distinguishing characteristics that would have placed Davis on notice that the tool was probably stolen. Moreover, a substantial period of time—about one year—intervened between the alleged theft of the router and its discovery in Davis's shed.[6] The State offered no evidence concerning when or how Davis came into possession of the router. While Balduck offered testimony that he had traded stolen tools to defendant in exchange for drugs, Blake Bentley, also a witness for the State, testified that he had traded his personal tools to Davis in exchange for drugs.

Thus, it is quite likely that Davis obtained the router by means that would not have put him on notice that it was probably stolen. We conclude that there was insufficient evidence to enable the jury to reasonably conclude that Davis knew or probably believed the router was stolen. While the trial court erred in failing to dismiss the charge as it pertained to the router, given our affirmance

---

**6.** The time intervening between the theft and the router's discovery significantly undermines any inference that Davis's mere possession of the router suggests that he would have had a reasonable belief that it was probably stolen. The situation would be different if, for example, the router had been stolen from Middleton the day before its discovery in Davis's shed. In contrast, the presence of the name "Goer" on the staple gun undercuts the significance of any intervening time between the staple gun's theft and its discovery in Davis's shed. Regardless of how many times the staple gun may have changed hands, the jury could have inferred that the owner's name etched into the tool would have placed Davis on notice that the tool was likely stolen.

regarding the staple gun, sufficient evidence remains to sustain Davis's class-B misdemeanor conviction for possession of stolen property under sections 76–6–408 and –412.[7]

## ALLEGEDLY IMPROPER TESTIMONY

At trial, Balduck testified that he had traded stolen property to defendants in exchange for drugs and that he had purchased drugs from defendants on several occasions. The State next called Bentley, who testified that he bought methamphetamine from Davis on one specific occasion in March 1995 and had also previously traded some of his tools to Davis for drugs.

Defendants contend that Balduck and Bentley's testimony was improperly admitted by the trial court under Rules 403 and 404(b) of the Utah Rules of Evidence. The State argues that the testimony was properly admitted. Moreover, the State contends that defense counsel failed to object to Balduck's testimony, and that, even if Bentley's testimony was improperly admitted, any error was harmless given the other evidence presented. Defendants respond that defense counsel did object to Balduck's testimony, but that the objection is not of record because the record was made electronically and the trial judge used the "mute" button while the objection was made and discussed at the bench. Defendants also contend the objection is evidenced by later statements on the record.

"To preserve an issue for appeal, a party claiming error in the admission of evidence must object on the record in a timely fashion." *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 931 (Utah 1993). *Accord State v. Ross*, 782 P.2d 529, 532 (Utah Ct.App. 1989). *See* Utah R.App. P. 24(a)(5); Utah R.

Evid. 103(a)(1). Moreover, " '[t]he burden is on the parties to make certain that the record they compile will adequately preserve their arguments for review.' " *Olson v. Park–Craig–Olson, Inc.*, 815 P.2d 1356, 1359 (Utah Ct.App.1991) (quoting *Franklin Fin. v. New Empire Dev. Co.*, 659 P.2d 1040, 1045 (Utah 1983)). "One who fails to make a necessary objection or who fails to insure that it is on the record is deemed to have waived the issue." *Lamb*, 869 P.2d at 931. Defendants have failed to ensure that the objection to Balduck's testimony, if in fact made, was preserved in the record.

■ If defendants objected to Balduck's testimony and that objection failed to appear of record, the appropriate course of action was to seek to supplement the record via Utah Rule of Appellate Procedure 11(h). *See State v. Moosman*, 794 P.2d 474, 478–79 n. 17 (Utah 1990) ("[Utah Supreme Court Rule 11(h), the substantially similar predecessor to current Utah R.App. P. 11(h),] envisions ... clarification of what actually occurred in the lower court that was excluded or omitted from the record."); *Olson*, 815 P.2d at 1359. Rule 11(h) "provides a reliable method for the reconstruction of events when the record has failed in some limited respect." *Olson*, 815 P.2d at 1359. The defendants have not sought to supplement the record, and "[c]ounsel's recollection of the course of proceedings is no substitute for a record of those proceedings." *Id.*[8]

Thus, defense counsel failed to preserve on the record any objection to Balduck's testimony, defendants' argument was not preserved for appeal, and we therefore decline to address it. *See State v. Olsen*, 869 P.2d 1004, 1010 (Utah Ct.App.1994) (concluding that defendant "cannot rely on an alleged

---

7. "Theft of property ... shall be punishable ... as a class B misdemeanor if the value of the property stolen is less than $300." Utah Code Ann. § 76–6–412(1)(d) (Supp.1997). Given our affirmance with respect to the staple gun and given testimony at trial that the staple gun had value, there is sufficient evidence to sustain Davis's possession-of-stolen-property conviction.

8. Even if defendants had tried to supplement the record, it is far from clear that such an attempt would have been well received. There is simply no hint in the record of the objection. The

transcript of Balduck's examination appears uninterrupted, the attorneys made no requests to approach the bench, and there is otherwise no indication of either a bench conference or the objection allegedly made by defense counsel. Defendants claim that a later statement by the prosecutor refers to the alleged objection made during Balduck's examination. The prosecutor's statement, quoted by defendants in their brief, is taken entirely out of context and can in no way be construed to refer to the alleged objection.

objection raised in a bench conference that was not preserved on the record").

Moreover, although defense counsel did object to the relevancy and prejudice of Bentley's testimony, we conclude that even if the objection is well taken, Bentley's somewhat cumulative testimony alone does not undermine confidence in the outcome given the similar—and far more damaging testimony—already offered by Balduck. *Cf. State v. Seale*, 853 P.2d 862, 874–75 (Utah) (holding that even if evidence was improperly admitted, any error was harmless), *cert. denied*, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993); *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992) (same). Consequently, even if the trial court did err in admitting Bentley's testimony, the error was harmless in light of the other evidence offered against defendants.

## CONCLUSION

First, we conclude that the search of the Davis and Hyatt property was supported by a reasonable articulable suspicion that Davis had violated his probation. Second, we conclude that the search of Hyatt's Escort was unlawful because the State failed to establish that there were facts known to the officers which supported a reasonable belief that Davis had common authority over the car. The trial court should have therefore suppressed the evidence found in the Escort. Third, we conclude that, regarding the staple gun, the State presented sufficient evidence to the jury from which it could reasonably conclude Davis was guilty of receiving stolen property. However, regarding the router, we conclude that the State presented insufficient evidence to convict Davis of receiving stolen property. Fourth we conclude that defense counsel failed to object on the record to Balduck's testimony and therefore defendants' improper-testimony argument is not

properly before us. Moreover, even if the trial court did err in admitting Bentley's testimony, the error was harmless given the other evidence presented.[9]

In view of the number of charges and their nature; the presence of multiple defendants; the factual complexity of the case; and the failure of the parties in their briefs, or otherwise on appeal, to delineate with any precision the impact of partial suppression on particular counts, we remand to the trial court to modify the judgments, as may be appropriate, in accordance with the governing legal principles pronounced herein—most particularly our suppression of all evidence recovered from the Escort.

GREENWOOD, J., concurs.

BENCH, Judge (concurring and dissenting):

I fully concur in the main opinion except for the section entitled "Search of Hyatt's Escort." Defendants never argue that the officers should not have searched the Escort because Davis did not have common authority or control over it. Defendants argue simply, "The fact that Davis was on probation is not cause enough in which to search either Davis or Hyatt or any of their belongings including vehicles and residence." I believe that the main opinion inappropriately departs from basic principles of appellate review when it decides the issue on grounds never urged by defendants in their brief on appeal. *See, e.g., American Towers Owners Ass'n v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1185 n. 5 (Utah 1996) ("Issues not briefed by an appellant are deemed waived and abandoned."); *Bott v. DeLand*, 922 P.2d 732, 741 (Utah 1996) ("Where an appellant fails to brief an issue on appeal, the point is waived."); *State v. Vigil*, 922 P.2d 15, 25 (Utah Ct.App.1996) ("It is well settled that an appellate court is not ' "a depository in

9. Defendants also argue that the prosecutor committed prosecutorial misconduct by misrepresenting to the court his reasons for introducing Bentley and Balduck's testimony. In support, defendants point to a post-trial statement by the prosecutor to a newspaper reporter which allegedly evidenced his ulterior motives for introducing the testimony. Defendants' argument is without merit. First, we have already concluded

that, because defense counsel failed to object on the record to Balduck's testimony, his testimony was properly admitted. Any prosecutorial motives related to the testimony's introduction are therefore irrelevant—ulterior or not. Second, the prosecutor's alleged statement was made post-trial to a newspaper reporter, is not part of the record on appeal, and consequently is not before us.

which the appealing party may dump the burden of argument and research." ' " (citations omitted)).

In any event, on the facts presented, the officers reasonably believed that Davis had common authority or control over the Escort. *See Illinois v. Rodriguez,* 497 U.S. 177, 185, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990) ("[W]hat is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable."); *see also Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

I would therefore affirm the convictions entered by the trial court.